Ralph C. ECONOMU

v.

BORG–WARNER
CORPORATION, et al.

Civ. No. H–84–463 (PCD).

United States District Court,
D. Connecticut.

Jan. 29, 1987.

William M. Laviano, Ridgefield, Conn., for plaintiff.

Henry P. Baer, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

### RULING ON MOTION FOR SUMMARY JUDGMENT

DORSEY, District Judge.

#### I. *Facts*

Plaintiff was hired by defendant Burns International Security Services, Inc. ("Burns") on May 3, 1976, as corporate comptroller. He was later promoted to Executive Vice-President and Chief Financial Officer. He left the company in July 1982. In 1981, Burns became a target for acquisition by defendant Borg-Warner Corporation ("Borg-Warner"). Negotiations took place between executives of both corpora-

tions and, on April 26, 1982, the Directors of Burns unanimously voted to approve the merger. On May 19, 1982, Burns became a subsidiary of Borg-Warner.

Prior to the merger, Burns' Directors approved new employment contracts for its senior executives which provided specified benefits if, as a result of a future acquisition, their employment was terminated or their duties reduced. Plaintiff's contract was approved by the Board on December 4, 1981, and signed by plaintiff on December 21, 1981.

Subsequent to the merger, Robert Gordon was appointed Executive Vice-President and Chief Operating Officer of Burns. Malcolm Baker was appointed Chairman of the Executive Committee and Chief Executive Officer of Burns. Gordon had been disappointed with plaintiff's performance and obtained Baker's permission to restructure the management information system department and the comptroller's office. On June 15, 1982, Baker and Gordon informed plaintiff that they would be hiring a new comptroller but that he could remain as Chief Financial Officer. Feeling that the restructuring constituted an "involuntary termination" under the Employment Agreement, plaintiff left his employment on July 18, 1982.

Plaintiff commenced this action on April 18, 1984, asserting six claims. Counts two and five have previously been dismissed. Plaintiff's remaining claims may be summarized accordingly:

*Count One:* Plaintiff claims that he was fraudulently induced to sign the 1981 contract based on defendants' false representations that he would be retained after any merger that might occur when, in fact, defendants had already decided to terminate plaintiff after the merger.

*Count Three:* Plaintiff claims that defendants' promises that he would be retained estop them from reneging on those promises. He also asserts a breach of a "just cause" standard for discharge applicable to him.

*Count Four:* Plaintiff claims that the denial of reimbursement for medical expenses for his daughter constitutes an intentional infliction of emotional distress.

*Count Six:* Plaintiff claims that defendants' actions constitute a breach of the implied covenant of good faith and fair dealing embodied in his employment relationship.

## II. *Procedural Posture*

Defendants have moved for summary judgment as to the remaining counts. "Rule 56(c) mandates the entry of summary judgment, ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The purpose "is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 2553. The non-moving party must go beyond his pleading and produce proof to support his claims. *Id.* Defendants have the basic burden of showing the absence of any genuine issue of material fact.

## III. *Choice of Law*

The threshold issue is the law to be applied.

A federal court sitting in diversity is bound to apply the law of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). This includes the conflict of laws principles. *SCA Serv., Inc. v. Lucky Stores,* 599 F.2d 178, 180 (7th Cir.1979); *CBS, Inc. v. Film Corp. of America,* 545 F.Supp. 1382, 1385 (E.D.Pa. 1982); 1 Restatement (Second) of Conflict of Laws § 7 (1971 and Supp.1985–86). Plaintiff argues that New York's conflict principles apply because Section 12 of the Employment Agreement specifically provided that disputes arising out of the em-

ployment relationship would be governed by New York law. According to plaintiff, this would require the court to apply the whole law of New York and not merely its substantive law. Plaintiff claims that this compels the conclusion under New York's conflict principles that Connecticut's substantive law and not New York's should apply. *See* 1 Restatement (Second) of Conflicts § 4 (1971 and Supp. 1985–86) ("local law" is defined as the substantive rules and principles of a jurisdiction exclusive of the conflict of laws; "law" is defined as the local law plus the conflicts principles). Plaintiff provides no authority for his convoluted proposition nor has any been found.[1]

> When [parties] ... choose the state which is to furnish the law governing the validity of their contract, the parties almost certainly have the "local law," rather than the "law," of that state, in mind.... To apply the "law" of the chosen state would introduce the uncertainties of choice of law into the proceedings and would serve to defeat the basic objectives, namely those of certainty and predictability, which the choice-of-law provision was designed to achieve.

1 Restatement (Second) Conflict of Laws § 187 comment h (1971 and Supp. 1985–86); *see also SCA Serv., Inc.,* 599 F.2d at 180; *Sullivan v. Savin Business Machines Corp.,* 560 F.Supp. 938, 939 (N.D.Ind.1983); *LaBeach v. Beatrice Foods Co.,* 461 F.Supp. 152, 156 (S.D.N.Y.1978). If plaintiff were correct, by resort to New York's conflicts principles, New York's substantive law would not apply in this case, leading to the obviously unintended result that the substantive law to be applied would be subject to the vagaries of each fact situation which could change over the course of the agreement. It would also result in the sole application of New York's conflicts principles to the derogation of New York's substantive law when the latter must have

---

**1.** As discussed *infra,* however, application of the "most significant relationship" standard to this case produces the same end result as would occur if New York's conflict rules were so applied. *See O'Connor v. O'Connor,* 201 Conn. 632, 649–50 n. 12, 519 A.2d 13, 21–22 n. 12 (1986).

been uppermost in the minds of the parties in choosing the forum, the law of which they agreed should apply.

## A. Contract Claims

■ Connecticut conflict of laws principles prompts the conclusion that New York law should apply. Traditionally, Connecticut has followed the "vested rights" approach to choice of law problems holding that "in contract actions the laws of the place of contracting governs substantive issues, ... and in tort actions the law of the place of injury governs substantive issues." *Schirm v. Auclair,* 597 F.Supp. 202, 205 (D.Conn.1984) (citations omitted); *see also DeFourneaux v. Sturm, Ruger & Co.,* 503 F.Supp. 2, 4 (D.Conn.1980) (tort), *aff'd,* 639 F.2d 768 (2d Cir.), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *Gibson v. Fullin,* 172 Conn. 407, 411, 374 A.2d 1061, 1064 (1977) (tort); *Dick v. Dick,* 167 Conn. 210, 223, 355 A.2d 110, 117 (1974) (contract); *Breen v. Aetna Cas. & Sur. Co.,* 153 Conn. 633, 637, 220 A.2d 254, 256 (1966) (contract). However, beginning with *Gibson,* the Connecticut Supreme Court questioned the lex loci analysis and referred to the choice of law analysis embodied in the 1 Restatement (Second) Conflicts of Laws § 145 (1971 and Supp. 1985–86) for tort actions.[2] *Gibson,* 172 Conn. at 411, 374 A.2d at 1064; *see also Simaistis v. Flood,* 182 Conn. 24, 33, 437 A.2d 828, 832–33 (1980). In *Halstead v. United States,* 535 F.Supp. 782, 786–87 (D.Conn. 1982), *aff'd sub nom. Saloomey v. Jeppesen & Co.,* 707 F.2d 671 (2d. Cir.1983) (tort), the court considered the *Gibson* dicta and concluded that the Connecticut Supreme Court would adopt the Restatement approach. The Restatement test in choice of law decisions has been adopted "for those cases in which application of lex loci would produce an arbitrary, irrational result." *O'Connor,* 201 Conn. at 650, 519 A.2d at 22 (tort). A similar reliance on the Restatement's approach to contract choice of law problems is suggested where application of the lex loci approach "would produce arbitrary, irrational results." *Id.* The Restatement approach to contractual choice of law problems is embodied in §§ 187 and 188. Section 187 provides that the law of the state chosen by the parties shall govern unless the state whose law was chosen either has nothing to do with the transaction, or application of that state's law would contradict a fundamental policy of a state which has a greater interest in the action and whose law would otherwise apply had it not been for the parties' choice. If the parties do not specify a choice of law, § 188 would apply the local law of the state having the most significant relationship to the transaction.[3]

In both §§ 145 and 188, the relevant factors are manifestations of the general principles outlined in § 6.[4] *O'Connor* assessed the § 145 principles against the perceived strengths of the lex loci approach and concluded the Restatement approach to

---

**2.** *See infra* note 6.

**3.** Section 188(2) provides:

In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

**4.** Section 6(2) provides:

When there is no [applicable state statute] ... the factors relevant to the choice of the applicable rule of law include
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

be the better rule. 201 Conn. at 643–48, 519 A.2d at 18–21. The same analysis is equally applicable to and counsels against "the categorical allegiance to the doctrine of lex loci in [contract] ... actions." *Id.* at 648, 519 A.2d at 21.

■ As to plaintiff's claim of promissory estoppel, breach of contract and breach of the implied covenant of good faith and fair dealing, New York law applies. First, Section 12 of the Employment Agreement provides that "[t]he validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the state of New York." This choice of law must be given due regard unless the choice of law provision is part of an adhesion contract or the product of fraud, duress, coercion or mistake.[5] 1 Restatement (Second) Conflict of Laws § 187 comment b. There is no indication that the choice of law was a product of such abuse. Furthermore, plaintiff's allegations that he was fraudulently induced to sign the contract do not go to the choice of law provision. *Burbank v. Ford Motor Co.*, 703 F.2d 865, 866–67 (5th Cir.1983). The parties freely entered into the Employment Agreement and chose New York law to be applied to controversies arising out of that contract. They are bound by that choice.

■ Parenthetically, even if Restatement § 187 did not apply, § 188 compels the same conclusion. It is undisputed that plaintiff's original employment was negotiated in New York, he maintained an office and staff there, the products of his service were rendered for use in the New York office, the business was in New York, he was paid in New York and he worked in New York. Connecticut's only connection is that (1) plaintiff is a Connecticut resident; (2) he performed a portion of his work in Connecticut (Plaintiff's Exhibit L); and (3) since he stopped working in 1982, he has been available for consultation, collected his checks and refrained from competing here, contacts which do not cast Connecticut with the most significant relationship to plaintiff's claims. Plaintiff's work in Connecticut constituted services for a company located in New York and was in lieu of his traveling to New York to perform such. Plaintiff estimated that substantially more work was performed in New York and other states than in Connecticut. Moreover, plaintiff's alleged activities since 1982 are hollow. He was not actively engaged in employment by defendants between 1982–85; he was merely collecting the benefits of his contract accrued by reason of his involuntary termination. His obligation not to compete, the receipt of his checks and his availability for consultation are of minimal significance in the choice of law analysis. *McKinney v. National Dairy Council*, 491 F.Supp. 1108, 1113–14 (D.Mass.1980).

**B.** *Tort Claims*

■ Plaintiff's tort claims for intentional infliction of emotional distress and fraud are likewise analyzed under the most significant relationship test. Section 145(2) "establishes [the] black-letter rules of priority [used] to facilitate the application of the principles of § 6 to tort cases."[6] *O'Connor*, 201 Conn. at 652, 519 A.2d at 23. In considering § 6(a) (the place of inju-

---

**5.** Plaintiff does not argue this exception. *See* 1 Restatement (Second) Conflict of Laws § 187(a) & (b).

**6.** Section 145 provides:
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

ry), the injury claimed was to plaintiff, not his daughter. Although the injury had impact on plaintiff in Connecticut, it was intimately tied to the employment relationship located in New York and should not dictate the application of Connecticut law. *See* 1 Restatement (Second) Conflict of Laws § 146; *Saloomey*, 707 F.2d at 676. As to § 6(b), it is undisputed that the conduct alleged to have caused the injury occurred in New York. It is further undisputed, with regard to § 6(c), that Burns' business was in New York; plaintiff's domicile is Connecticut. However, Connecticut's interest in protecting its citizens from such tortious conduct is adequately served by New York's recognition of the tort of intentional infliction of emotional distress.[7] *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215, 1217 (1978). Finally, as to § 6(d), it has already been held that the situs of the parties' relationship was New York. Therefore, on balance, and in consideration of the principles in § 6, New York law must apply to plaintiff's claim of intentional infliction of emotional distress.

■ As to the claim of fraud, 1 Restatement (Second) Conflicts of Law § 148 directs that New York law apply.[8] The allegedly fraudulent statements were made by defendants' employees in New York, were received and allegedly relied on by plaintiff in New York and allegedly caused harm to plaintiff's employment relationship, the situs of which was in New York. *Bailey Employment System, Inc. v. Hahn*, 655 F.2d 473, 476 (2d Cir.1981).

## IV. *Fraud and Deceit*

■ Plaintiff claims he was fraudulently induced to enter the Employment Agree-

ment based on statements made by certain Burns' Directors that such agreements would make Burns a more attractive target for acquisition. Complaint at ¶¶ 19, 20; Economu Deposition at 275–77, 362–66, 377–78. He further claims that he was fraudulently induced to support the acquisition based on representations by Robert LaRoche and Donald Trauscht that "all senior management at Burns would be retained subsequent to the merger ... [and] [t]hat Burns would not be divisionalized but would retain its independence as a 'stand alone' subsidiary of Borg-Warner." Complaint at ¶¶ 23, & 24–26; Economu Deposition at 383–88, 393–96. Plaintiff's claims are without merit.

An action for fraud in New York requires (1) representation of a past or present fact, not one of future intention; (2) known by the speaker to be untrue at the time it was made; (3) made with an actual intent to deceive; and (4) which causes the person hearing the statement to rely on it and suffer injury as a consequence. *Galvez v. Local 804 Welfare Trust Fund*, 543 F.Supp. 316, 318 (E.D.N.Y.1982). Defendants first argue that plaintiff should be precluded from litigating this claim on the basis of res judicata.[9] It is undisputed that plaintiff submitted thirteen claims relating to his employment agreement to arbitration pursuant to Section 14 of that agreement. Section 14 provides, in relevant part: "Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration in accordance with the rules of the American Arbitration Association then in effect." Plaintiff's claim that he was fraudulently induced to sign his Employ-

---

7. In fact, on this issue, the decision on defendants' motion would be the same whether New York or Connecticut law applied.

8. Section 148(1) provides:
 When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state

determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

9. Contrary to Plaintiff's memorandum, defendants do not seek arbitration of the fraud claims and thus plaintiff's claim of waiver is meritless.

ment Agreement is clearly covered by this clause. "A broad arbitration agreement reflects a general desire by the parties to have all issues decided speedily and finally by the arbitrators." *Weinrott v. Carp*, 32 N.Y.2d 190, 196, 344 N.Y.S.2d 848, 854, 298 N.E.2d 42, 46 (1973). "As a general rule ... under a broad arbitration provision the claim of fraud in the inducement should be determined by arbitrators." *Id.* at 199, 344 N.Y.S.2d at 856, 298 N.E.2d at 48.[10] As plaintiff's claims were therefore within the purview of the arbitration clause, he may not assert such claim in this subsequent action.[11] *Schattner v. Girard, Inc.*, 668 F.2d 1366, 1368 (D.C.Cir.1982). Plaintiff was given the opportunity to litigate his claims under the contract at arbitration and, in fact, relied on the validity of that contract as a basis for his claims. He cannot now be heard to claim that it is invalid as a result of fraudulent inducement. *Ritchie v. Landau*, 475 F.2d 151, 156 n. 5 (2d Cir.1973).

Plaintiff's argument that he was not fully aware of the fraud at the time of filing his arbitration claims is not borne out by the record. Plaintiff provides no support for his claim in this regard. By his own admission, in June of 1982, plaintiff was made aware by Baker that his duties "would be virtually eliminated and taken over by an individual from Baker Industries ... [and] that contrary to the statements made by Mr. LaRoche and Mr. Trauscht, that Burns would in fact be reporting to Baker Industries instead of directly to Borg-Warner as they had stated." Economu Deposition at 365–66. Also in 1982, plaintiff, along with his attorney/friend, Don Wilmont, was made aware that he would be involuntarily terminated. *Id.* at 366. The status report, cited as

evidence of defendants' intention not to perform the contract, is dated November 13, 1981. Plaintiff's Exhibit E–1. The only fact of which plaintiff was not aware when he filed for arbitration, in March of 1983, was defendants' advertisement to fill his job without his permission, allegedly not discovered until early 1984. Economu Deposition at 365. However, clearly he knew in 1982 that his job was in jeopardy. Thus, the facts on which plaintiff now relies to support his claim of fraudulent inducement were known to him before he filed for arbitration. Accordingly, he is barred by res judicata from now litigating this claim. *Schattner*, 668 F.2d at 1368.

Even if plaintiff's claim was not so barred, he has failed to satisfy the elements of a cause of action for fraud. First, with regard to his claim that he was fraudulently induced to support the merger, no action can lie, since, even without his support, the merger would have occurred. The vote for the merger was unanimous and the Burns family comprised over 50% of the Board's vote. Plaintiff's vote was not essential for the merger approval. "[A] *sine qua non* of any recovery for misrepresentation is a showing of pecuniary loss proximately caused by reliance on the misrepresentation." *Day v. Avery*, 548 F.2d 1018, 1029 (D.C.Cir.1976) *cert. denied*, 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1971); *see also Ritchie*, 475 F.2d at 156. Absent such a showing, he is not entitled to a trial on this issue.[12] *Day*, 548 F.2d at 1029.

Plaintiff has also failed to offer evidence of all the elements of his claim of fraudulent inducement in the signing of his employment contract. The basis for this claim is a statement at Board of Directors

---

**10.** Plaintiff's claim that this issue was in doubt at the time he filed his action, citing *Matter of Wrap-Vertiser Corp. (Plotnick)*, 3 N.Y.2d 17, 163 N.Y.S.2d 639, 143 N.E.2d 366 (1957), is meritless. As of 1977, the year *Weinrott* was decided, the law was clear. In fact, *Wrap-Vertiser* was expressly overruled in *Weinrott*, 32 N.Y.2d at 199, 344 N.Y.S.2d at 856, 298 N.E.2d at 47.

**11.** While this general rule would not be applied if the fraud reached the arbitration clause directly or was so pervasive as to reach the arbitration clause indirectly, *Weinrott*, 32 N.Y.2d at 198, 344 N.Y.S.2d at 855, 298 N.E.2d at 46, there is no ground for such a claim in this case.

**12.** Therefore, it is unnecessary to discuss whether plaintiff has satisfied the remaining elements of his claim of fraud.

meetings in late 1981 that the contract would "ensure the continuity of management, which would make the company more attractive to a potential acquirer." Economu Deposition at 277. This insight was reflected in plaintiff's contract, to wit: "WHEREAS, the company wishes to assure itself and the Executive of the continuity of management in the event of any 'Change in Control.'" Employment Agreement at 1. However, the contract also sets out elaborate guarantees to plaintiff of up to three years of continued salary and other benefits if he was involuntarily terminated, *id.* at Section 8, provisions solely protective of plaintiff's interests. Moreover, the "WHEREAS" clause expresses the employer's *wish* to retain management—not a promise. A memorandum to the Compensation Committee from Meredith Associates, Inc. indicates that involuntary termination of the employees was a possible consequence. *See* Plaintiff's Exhibit D. "Wishes" or "desires" are not manifestations of future intent, nor promises of continued employment and as such do not satisfy the first element of a fraud claim. *Carlton v. Interfaith Medical Center,* 612 F.Supp. 118, 125 (E.D.N.Y.1985); *Galvez,* 543 F.Supp. at 318. This is particularly clear from plaintiff's description of LaRoche's and Trauscht's statements in their April 23, 1982, meeting with Burns' executives. These statements are significant as to the allegation that a conspiracy existed before plaintiff signed the contract and are relevant to the belief he was working under, although made after the signing of the contract and, therefore, not facts on which plaintiff might rely. "[I]t was Mr. LaRoche who said that ... it was Borg-Warner's *intention* ... that management of Burns would continue to control its own destiny ... and that everyone affected should *essentially* be comfortable that in the event the merger was made that nobody's job *essentially* would be in jeopardy." Economu Deposition at 387–88 (emphasis added). This suggests Borg-Warner's *intention* to retain management and not a promise nor representation that plaintiff's employment was guaranteed. Absent evidence of the elements of fraud, summary judgment is granted on this count. *Carlton,* 612 F.Supp. at 125.

## V. *Promissory Estoppel*

"In New York the elements of a claim for promissory estoppel are: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.'" *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 264 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984), quoting *Ripples of Clearview, Inc. v. LeHavre Associates,* 88 A.D.2d 120, 452 N.Y.S.2d 447, 449 (N.Y.App.Div.1982) (citations omitted). As discussed with regard to the fradulent inducement claim, because plaintiff provides no evidence of defendants' factual representations to him, he has failed to show any clear or even an ambiguous promise. Similarly, his failure to show any loss resulting from his allegedly fraudulently induced support of the merger precludes any injury from being found to have been sustained as a result of his reliance on an alleged promise. Plaintiff provides no case authority nor facts in the record which support this claim. Mere assertions simply do not suffice and summary judgment is, therefore, appropriate on this issue. *Celotex Corp.,* 106 S.Ct. at 2553 (the non-moving party must go beyond his pleading and produce proof to support his claims).

## VI. *Breach of Contract*

Plaintiff claims in Count Three that defendants breached his contract by terminating him without just cause. Although the complaint is unclear, he may be relying on two theories. First, that the Employment Agreement was void as the result of the alleged fraud and thus his employment could only be terminated for just cause as required by the Burns family policy. *See* Depositions of Douglas Woundy at 34; Walter Perry at 85–86; George King at 25–29. Second, he may be claiming that, even if the Employment Agreement

was effective, the Burns family policy of just cause was incorporated into the contract.[13] Plaintiff's employment with Borg-Warner was defined by his Employment Agreement. As plaintiff relied on that agreement in his arbitration claims and, as held herein, that contract was valid and enforceable. Thus, the first possible theory for breach of contract has no merit.

Subsequent to the merger, the financial department at Burns was restructured, resulting in the replacement of plaintiff as Vice-President and Comptroller by Richard Duch. Plaintiff retained his position as Chief Financial Officer, but apparently in name only. The Accounting and Management Information System Department personnel reported directly to Mr. Duch. Plaintiff's Exhibit J–2. These circumstances 'were the basis for plaintiff's invoking the involuntary termination provision in Section 8(f) of his contract and leaving defendants' employment on July 19, 1982. Plaintiff's Exhibit J–4. Section 8(e) defines involuntary termination as any resignation following a material breach of the agreement—including "any significant reduction by the Company in the position, duties, compensation ... to be provided to the Executive." Defendants admitted an involuntary termination in the arbitration, Plaintiff's Exhibit K–6 (Answer to Claim No. 1), and the arbitration panel so found. Defendants' Exhibits B, C and D.

 However, the agreement expressly allowed for an involuntary termination and plaintiff cannot now be heard to complain about it. Plaintiff was guaranteed, as "liquidated damages or severance pay or both," payment of his base salary for the entirety of the term of employment, as specified in the agreement, plus other benefits. Employment Agreement, Section 8(f). In arbitration, plaintiff was awarded his base salary, $95,000, for the three years remaining in his employment contract. Arbitration Findings B & C. Despite plaintiff's receipt of the award, as provided by the contract in the event of an involuntary termination, he now claims the termination was a breach of the contract without "just cause." Nowhere in Section 8(e), which specifically allows for involuntary termination, nor anywhere in the contract, are defendants required to have a "just cause" for their actions. Obviously, defendants evaluated plaintiff's worth to the company and the effectiveness of his department. While their subsequent actions may have provoked plaintiff to claim an involuntary termination, they simply invoked the contract which was their right. *Murphy v. American Home Prod. Corp.*, 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86, 89 (1983) (It is a "long-settled rule that where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason."). Moreover, plaintiff's claim that the alleged Burns family policy of "just cause" termination was incorporated into the contract is refuted by Section 11(f): "No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either party which are not set forth expressly in this Agreement." Accordingly, summary judgment is granted as to the claim of breach of contract.

### VII. *Intentional Infliction of Emotional Distress*

 Plaintiff claims in Count Four that defendants' denial of reimbursement of medical expenses plaintiff incurred for his children constituted the intentional infliction of emotional distress.[14] Plaintiff's

---

**13.** On December 19, 1985, the court denied plaintiff's motion to amend his complaint to add a seventh count for breach of contract holding that the parties agreed to arbitrate such claims and, therefore, he could not now seek judicial redress. *Economu v. Borg-Warner*, Civ. No. H–84–463 (D.Conn. Dec. 19, 1985), Ruling on Pending Motions at 10, citing *United States v. Peter*

*Kiewet Sons*, 345 F.2d 879 (8th Cir.1965). For largely the same reasons, this claim should similarly be dismissed. The claim is addressed only to show its complete lack of merit.

**14.** On September 26, 1986, a jury in *Economu v. Metropolitan Life Ins. Co.*, Civil No. H–84–1034 (D.Conn.), found that plaintiff did not prove

entitlement to reimbursement for medical expenses was defined by his insurance contracts. His claim was, therefore, against the insurer, Metropolitan Insurance Co., and not against the defendants. Plaintiff claims that defendants are liable based on promises of another "basket plan" which provided him with additional coverage. Plaintiff's Memorandum at 26. Plaintiff's claim is without merit. No evidence of such a plan has been produced.[15] Plaintiff cannot contest a summary judgment motion on mere allegations, particularly in view of the exhaustive discovery that has been conducted. *Celotex*, 106 S.Ct. at 2553.

Finally, plaintiff has failed to offer proof of the claim of emotional distress in the remaining allegations in the complaint.

> An action may lie for intentional infliction of severe emotional distress "for conduct exceeding all bounds usually tolerated by decent society." (Prosser, Torts [4th ed.], § 12, p. 56). The rule is stated in the Restatement, Torts 2d as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." ... "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly untolerable in a civilized community."

*Fischer*, 43 N.Y.2d at 557, 402 N.Y.S.2d at 992–93, 373 N.E.2d at 1217 (citations omitted); *Collins v. Gulf Oil Corp.*, 605 F.Supp. 1519, 1521 (D.Conn.1985). None of plaintiff's allegations come close to the type of outrageous character required. *Murphy v. American Home Prod. Corp.*, 112 Misc.2d 507, 447 N.Y.S.2d 218, 220 (1982), *aff'd*, 58 N.Y.2d 293, 303, 461 N.Y. S.2d 232, 236, 448 N.E.2d 86, 90 (1983). *See also Collins*, 605 F.Supp. at 1521–22; *Wells v. Thomas*, 569 F.Supp. 426, 434 (E.D.Pa.1983). "In *Wells*, the court granted summary judgment in the face of allegations that the employee was stripped of her position, placed in a newly-created position with no responsibilities, her office was taken away, her secretary was reassigned to someone else, she was given poor performance evaluations where for twenty-five years she had only received excellent ratings, she was not given annual salary increases and finally she was terminated, all allegedly without cause." *Collins*, 605 F.Supp. at 1522 n. 4, citing *Wells*, 569 F.Supp. at 433. Furthermore, the New York Court of Appeals has expressly refused to allow a claim of wrongful infliction of emotional distress to end run the fact that New York does not recognize the tort of abusive discharge. *Murphy*, 58 N.Y.2d at 300–03, 461 N.Y.S.2d at 235–36, 448 N.E.2d at 90. Accordingly, summary judgment is granted on this count.

## VIII. *Good Faith and Fair Dealing*

Plaintiff's last count states that defendants breached an implied covenant of good faith and fair dealing embodied in his employment relationship with them.

> [I]n the case now before us, plaintiff's employment was at will, a relationship in which the law accords the employer an unfettered right to terminate the employment at any time. In the context of such an employment, it would be incongruous to say that an inference may be drawn

---

that his daughter "was eligible to require and receive reimbursement for medical expenses."

Under res judicata, a final judgment on the merits of an action precludes the parties or the privies from relitigating issues that were or could have been raised in that action. *Allen v. McCurry*, 449 U.S. 90, 93 [101 S.Ct. 411, 414, 66 L.Ed.2d 308] (1980); *Cromwell v. County of SAC*, 94 U.S. 351, 352 [24 L.Ed. 195] (1877). Under collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relit-

igation of the same issue on a different cause of action between the same parties. *Montana v. United States*, 440 U.S. 147, 153, [99 S.Ct. 970, 973, 59 L.Ed.2d 210] (1979).

*Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 466–67 n. 6, 102 S.Ct. 1883, 1889–90 n. 6, 72 L.Ed.2d 262 (1982).

**15.** Defendants' vehemently dispute any other plan which might cover his claims. Defendants' Reply Memorandum at 22.

that the employer impliedly agreed to a provision which would be destructive of his right of termination. The parties may by express agreement limit or restrict the employer's right of discharge, but to imply such a limitation from the existence of an unrestricted right would be internally inconsistent.

*Murphy*, 58 N.Y.2d 304–05, 461 N.Y.S.2d at 237, 448 N.E.2d at 90–91. Plaintiff's involuntary termination was an event expressly covered by the contract. *Carlton*, 612 F.Supp. at 124 (New York does not recognize claims of breach of implied covenant of good faith and tortious wrongful discharge.). This claim is without merit and summary judgment is granted.

Accordingly, summary judgment is granted as to all counts.

SO ORDERED.