**Ralph C. ECONOMU,**
**Plaintiff-Appellant,**

v.

**BORG–WARNER CORPORATION and Burns International Security Services, Inc., Defendants-Appellees.**

No. 1269, Docket 87–7188.

United States Court of Appeals, Second Circuit.

Argued June 18, 1987.

Decided Sept. 16, 1987.

312

William M. Laviano, Ridgefield, Conn., for plaintiff-appellant.

John P. Furfaro, New York City (Henry P. Baer, Maury B. Josephson, Skadden, Arps, Slate, Meagher & Flom, New York City, of counsel), for defendants-appellees.

Before OAKES, MESKILL, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Ralph C. Economu appeals from two separate but related rulings of the United States District Court for the District of Connecticut, Peter C. Dorsey, *Judge.* Economu commenced this action against his former employer, Burns International Security Services, Inc. ("Burns"), and Burns's corporate parent, Borg-Warner Corporation ("Borg-Warner"), alleging various claims relating to termination of Economu's employment by Burns. The first ruling from which Economu appeals is an order dated December 19, 1985, that dismissed Economu's claim under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34 ("ADEA"), as not having been timely filed, as well as his claim under the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. Ann. §§ 42–110a to –110q (West 1987) ("CUTPA"), for failure to allege a nexus with the general consuming public. The second ruling, dated January 28, 1987, granted summary judgment to defendants on Economu's remaining claims, including fraud and deceit, promissory estoppel, breach of contract, and the intentional infliction of emotional distress.

Finding no merit in any of Economu's arguments on appeal, we affirm.

## BACKGROUND

In May 1976 Burns hired Economu as corporate controller. Two years later Economu was elected to Burns's board of directors, and approximately four months after that was appointed executive vice president-finance and chief financial officer.

In 1980 Burns became a candidate for corporate acquisition, which prompted its board to provide certain senior executives, including Economu, with protective employment agreements, sometimes called "golden parachutes". Economu signed his agreement on December 21, 1981. It provided, *inter alia*, that Economu would continue to receive his salary and benefits for a three-year period commencing on the date of any "change in control" of Burns, and that any dispute arising from the employment agreement would be resolved exclusively through arbitration. Economu claims that as a member of the board of directors he voted to approve those employment agreements on the representation of other directors that having senior management available and bound to continue in place would make Burns more attractive to a corporate suitor.

Borg-Warner first became interested in acquiring Burns in the summer of 1981. After various discussions and reviews of corporate documents, Borg-Warner and Burns agreed to the terms of a sale in early 1982. In April of that year two vice presidents of Borg-Warner, Donald Trauscht and Robert LaRoche, met with Burns's management to inform them of the acquisition. Among the items discussed at that meeting was Borg-Warner's stated intention to retain the management of Burns and to allow Burns to operate independently of Borg-Warner. After the Burns board of directors unanimously voted its approval, the merger was consummated on May 19, 1982.

In his complaint, Economu alleged that, contrary to the representations of Trauscht and LaRoche, Borg-Warner and Burns had privately conspired to terminate Burns's senior management officers soon after the merger. Economu contends that the defendant corporations surreptitiously sought to replace the older executives of Burns, including himself, with younger individuals in an effort to avoid payment of higher salaries, pensions, and other fringe benefits.

In fact, soon after the change in control, Burns hired a new controller, Richard Duch, who was scheduled to assume several of Economu's duties. Although conceding that Duch was younger than Economu, Burns denied that the reduction in Economu's duties had anything to do with age but rather asserted that the reduction was the result of Economu's poor work performance in the early part of 1982.

On June 18, 1982, Economu wrote a letter to Robert Gordon, executive vice president and chief operating officer of Burns, setting forth his understanding from their meeting three days earlier with Burns's chief executive officer that Duch would be assigned several of the duties for which Economu had previously been responsible as senior vice president-finance. Furthermore, Economu explained his belief that the changes in his responsibilities constituted an "involuntary termination" under his employment agreement, and expressly stated that his continuation in employment would not constitute a waiver of any rights under that agreement. The employment agreement defines the term "involuntary termination" to include a discharge by Burns or a resignation by the executive following a material breach of the agreement, such as "any significant reduction by the Company in the [executive's] duties".

On June 25, Gordon sent to Economu a new table of organization for Burns's financial department, reflecting "all the changes that are transpiring." In the accompanying memorandum Gordon stated that "[t]here will probably be adjustments but this is the way we will operate for the time being." The organizational chart indicated that while Economu would retain a position of substantial authority as vice president-finance to whom the insurance department, internal audit department, and

a portion of the financial services department would report, Duch as the new vice president-controller would be responsible for several other subdivisions that had previously reported to Economu—financial reporting, management information systems, and another portion of the financial services department.

After receiving the new organizational chart and accompanying memorandum, Economu met with Gordon on June 28. In his pretrial deposition Economu stated that the reason for that meeting was to resolve the ambiguity and uncertainty surrounding his job status and responsibilities. Gordon, however, did not make any more definite statement regarding Economu's position. Stating that he could not work under such tenuous circumstances, Economu related to Gordon that while he was on vacation during the first two weeks of July Gordon should communicate with Economu's personal attorney, Donald Wilmot, so that, in Economu's words, "when I got back from vacation, I knew where I stood, Burns knew where it stood and everybody could come up with a satisfactory situation."

On July 9, 1982, while Economu was on vacation, Gordon, along with Burns's general counsel, met with Wilmot and informed him that Burns was no longer interested in Economu's services. Duch had begun working at Burns just three days earlier, on July 6.

Upon returning from vacation and being informed of Gordon's statement to Wilmot, Economu tendered his resignation in a letter dated July 19, "[b]ecause of a significant reduction by [Burns] in my position and duties since the change in control".

The district court dismissed Economu's ADEA claim as having been untimely filed. The court ruled that a prima facie case for age discrimination could have been made out in June 1982 when plaintiff was first told of the proposed diminution of his duties and their transfer to a younger, new employee, rather than in July when Economu formally resigned. Despite the equivocal nature of Gordon's earlier communications with Economu, the district court held that Economu had sufficiently definite no-

tice of the allegedly discriminatory act by June 25, 1982, the date on which Economu received the new organizational chart. Because Economu filed his administrative complaint on May 6, 1983, more than 300 days later, the district court dismissed the claim under Fed.R.Civ.P. 12(b)(6).

In addition, the district court dismissed Economu's claim that Burns's intentional act of denying reimbursement to Economu for medical expenses incurred by him on behalf of his daughter constituted an unfair trade practice under the CUTPA. The district court deemed that matter to be a private dispute that was outside the scope of the CUTPA.

In a second ruling dated January 28, 1987, 652 F.Supp. 1242, the district court granted summary judgment to defendants on Economu's remaining claims. The court ruled that Economu's claim that he had been fraudulently induced to sign his employment contract was a matter that should properly have been raised in the arbitration proceeding that Economu had brought against Burns to resolve a dispute over the amount of salary and fringe benefits to which he was entitled. Since Economu had, in that arbitration proceeding, relied on the validity of the contract to assert claims relating to his remuneration, the district court ruled that he could not now argue that the contract was void.

With regard to the substance of the fraud claim, the district court held that the statements upon which Economu claims to have relied—the comments of Burns's directors regarding the advisability of employment agreements for management personnel and of Borg-Warner representatives Trauscht and LaRoche indicating Borg-Warner's intention to retain senior management and to permit Burns to operate as an independent subsidiary—were not actionable promises but rather only "wishes" or "desires" of defendants. Similarly, the district court ruled that Economu's claim that Burns was precluded from terminating his employment under the doctrine of promissory estoppel must fail because Economu could show neither a "clear and unambiguous promise" upon which he could reason-

ably and foreseeably rely, nor any pecuniary loss.

Economu also had claimed that the Burns family policy not to dismiss employees except for "just cause" precluded his dismissal, but the district court rejected that claim as being contrary to the express terms of the employment agreement. Finally, the district court found to be without merit Economu's claims of intentional infliction of emotional distress relating to the denial of his medical expense claim, and of defendants' breach of the implied covenant of good faith and fair dealing embodied in the employment contract. Accordingly, summary judgment was granted to defendants on Economu's state law claims.

This appeal followed.

## DISCUSSION

With regard to the dismissal of Economu's ADEA and CUTPA claims, we are required to accept Economu's factual allegations as true. *See Dacey v. New York County Lawyers' Association*, 423 F.2d 188, 191 (2d Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970). As for the grant of summary judgment to defendants on Economu's remaining claims, we view the facts on appeal in a light most favorable to Economu. *See Sullivan v. Town of Salem*, 805 F.2d 81, 83 (2d Cir.1986).

### A. *Order of dismissal.*

#### 1. *ADEA claim.*

■ A prerequisite for filing a federal civil action under the ADEA is the filing of a timely charge of unlawful discrimination with the Equal Employment Opportunity Commission ("EEOC"). Ordinarily, such charge must be filed within 180 days after the alleged unlawful act occurred. *See* 29 U.S.C. § 626(d)(1). However, the filing limitation period is extended to 300 days when, as is the case here, the state within which the alleged act of age discrimination occurred has a law prohibiting age discrimination in employment and authorizes a state agency to enforce that law. *See id.* §§ 626(d)(2), 633(b).

Thus, Economu had 300 days within which to file his charge with the EEOC. Determining when the 300–day limitation period began to run, however, is a more nettlesome issue.

In *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the Supreme Court expressly rejected a brightline, last-day-of-work rule, *id.* at 255–56, 101 S.Ct. at 503, holding instead that the filing limitation period for claims of employment discrimination commences on the date the allegedly discriminatory decision "was made and communicated to [the employee]." *Id.* at 258, 101 S.Ct. at 504. Thus, the last date of employment may not always coincide with the start of the statutory limitation clock. *O'Malley v. GTE Service Corp.*, 758 F.2d 818, 820 (2d Cir.1985). Rather, the limitation period begins to run "on the date when the employee receives a definite notice of the termination". *Miller v. IT & T*, 755 F.2d 20, 23 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985) (citations omitted). We must look, therefore, to the date on which defendants "had established [their] official position—and made that position apparent to [Economu]." *Ricks*, 449 U.S. at 262, 101 S.Ct. at 506.

■ Economu's allegations are not consistent on this point. In his complaint, Economu alleged that Burns and Borg-Warner "reneged on all of their promises and involuntarily terminated me on or about 7/23/82". However, in his charge filed with the EEOC, Economu stated that the unlawful discriminatory practice was his "constructive discharge and/or involuntary termination", which had occurred on or about July 19, 1982. Despite these claims, however, we are compelled to conclude, after applying the *Ricks* standard to the record before us, that defendants' allegedly discriminatory conduct was made apparent to Economu, and therefore "occurred", at the latest, by July 9, 1982. Consequently, the EEOC filing made 301 days thereafter was untimely.

Initially, Economu received express notice of his change of duties by June 25, and although the organizational chart was

"probably" subject to "adjustments", Economu was clearly notified at that time that his job status had changed substantially. Referring to this reduction of duties in his EEOC charge, Economu stated that he had "protested the situation *in late June, 1982.* It was made clear to me that my former duties and responsibilities would not be returned to me and that this constituted an involuntary termination." (Emphasis supplied). Furthermore, in his deposition Economu stated his belief that it was the June 25 memorandum that made him appreciate "the full reduction in the responsibilities that were being contemplated."

Gordon removed any uncertainty that might have remained when he and Burns's general counsel met with Economu's attorney, Wilmot, on July 9, 1982, and conveyed Burns's decision to discharge Economu. Economu claims that he did not actually learn of that conversation until July 19, 1982; nevertheless, by the express, explicit notice to the attorney whom Economu had entrusted with handling the dispute and with whom Economu had requested Gordon to deal, Burns must be considered, in the language of *Ricks,* to have "established its official position—and made that position apparent" to Economu. No more was needed to begin the 300–day limitation period. As of July 9, 1982, therefore, Economu had received notice sufficiently definite to permit him to make out a *prima facie* case of age discrimination, *see Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 919–20 (2d Cir.1981); accordingly, the district court properly dismissed the ADEA claim as time-barred.

### 2. *CUTPA claim.*

On appeal, Economu does not challenge the dismissal of his claim that defendants violated the CUTPA by intentionally interfering with the reimbursement of medical expenses incurred by him on behalf of his daughter. Accordingly, we affirm the dismissal without passing upon the substance of or reasoning behind the district court's ruling.

### B. *Summary judgment ruling.*

Even when viewed in a light most favorable to Economu, the facts of this case raise no genuine issue of material fact regarding Economu's several remaining state law claims. Accordingly, we affirm the grant of summary judgment to defendants on each claim.

Preliminarily we note that the district court concluded, after an extensive choice-of-law analysis, that New York law should govern Economu's state law claims. Economu presently makes no argument that the district court erred in its choice-of-law ruling. Accordingly, we also apply New York law in reviewing the disposition of Economu's state law claims.

We agree with the district court that Economu's claim of fraudulent inducement should have been raised in the arbitration proceeding relating to his employment agreement. The arbitration clause was broadly phrased and deemed arbitration to be the "exclusive" means of resolving disputes concerning that agreement. Accordingly, the related fraud claim should have been determined by the arbitrators. *See Weinrott v. Carp,* 32 N.Y.2d 190, 199, 344 N.Y.S.2d 848, 856, 298 N.E.2d 42, 48 (1973).

Moreover, Economu raised no triable issue of fact regarding Burns's stated purpose in signing its executives to employment agreements. As a result, both his fraud and promissory estoppel claims must fail. *See Murray v. Xerox Corp.,* 811 F.2d 118, 121 (2d Cir.1987) (fraud claim); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 264 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (promissory estoppel claim). Wanting to appear more attractive to a potential acquiring corporation is hardly a factual representation or promise of continued employment upon which Economu could reasonably rely. Indeed, the agreement itself anticipates a possible dismissal and, in such an event, assures the dismissed executive continued remuneration for three years. Similarly, we agree with the district court's characterization of Trauscht and LaRoche's statements as Borg-Warner's "wishes" or "de-

sires", as opposed to promises, to retain Burns's management and operate Burns as a "stand-alone" subsidiary.

■ Furthermore, the district court correctly rejected Economu's argument that he could not be discharged without cause. Because the employment agreement expressly contemplated such a discharge, the employment relationship was terminable at will, *see Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 300, 461 N.Y.S.2d 232, 235, 448 N.E.2d 86, 89 (1983), and because the agreement is a complete integration, we may not consider a "just cause" standard implied from some prior agreement, *see* Restatement (Second) of Contracts § 213 & comment a (1981). In addition, Economu's allegations raise no genuine issue of material fact regarding defendants' alleged breach of the covenant of good faith and fair dealing implied in the employment contract. *See Carlton v. Interfaith Medical Center*, 612 F.Supp. 118, 124 (E.D.N.Y.1985).

■ Finally, Economu's claim of intentional infliction of emotional distress for the challenged medical expense claim borders on the frivolous. Another federal civil action had found that Economu had failed to prove his eligibility for reimbursement. *Economu v. Metropolitan Life Insurance Co.*, No. H–84–1034 (D.Conn. Sept. 26, 1986). Moreover, Economu presented no proof of an alleged "basket plan" under which Burns would provide additional insurance coverage. Perhaps most significantly, defendants' conduct did not meet the necessary legal standard, for it did not exceed "all possible bounds of decency" and cannot fairly be regarded as "atrocious" or "utterly intolerable in a civilized society". *Fischer v. Maloney*, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215, 1217 (1978).

We have carefully reviewed Economu's remaining claims and find them to be without merit. The order and judgment of the district court are, therefore, affirmed.