George C. BRANDEWIEDE

v.

EMERY WORLDWIDE.

Civ. No. 5–90–504 (WWE).

United States District Court,
D. Connecticut.

Nov. 24, 1992.

Gary L. Johansen, Scheffler & Johansen, Westport, CT, Frank P. Luberti, Jr., Stamford, CT, for plaintiff.

Carol K. Young, Schatz & Schatz, Ribicoff & Kotkin, Stamford, CT, Stephen J. Fearon, Condon & Forsyth, New York City, for defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

EGINTON, Senior District Judge.

Defendant Emery Worldwide ("Emery"), a Delaware Corporation, brings this motion for summary judgment under Fed.R.Civ.P. 56(b) on the grounds that plaintiff's contract claim is governed by New York law and, thus, is barred by the New York Statute of Frauds governing oral fee agreements. Emery also contends that plaintiff fails to state a claim

under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110g(f). For the reasons stated below, summary judgment will be denied.

### Facts

In accordance with the standard for determining a motion for summary judgment as set forth below, the court accepts the facts as alleged by Plaintiff George C. Brandewiede and recited below to be true solely for the purposes of this motion. Brandewiede is a New York based finder, in the business of representing purchasers, sellers, lessors, and lessees of new and used commercial aircraft. Brandewiede's relationship with Emery began in 1987, when Emery was completing its acquisition of Purolator Courier Corporation ("Purolator"). Through his contacts at Salomon Brothers, Emery's investment advisor on the Purolator acquisition, Brandewiede learned that Emery was interested in selling or leasing some of its aircraft fleet in order to pay off some of the debt incurred in the acquisition.

Through his contacts at Polaris Aircraft Leasing Corporation ("Polaris"), a California-based corporation, Brandewiede also knew that Polaris was interested in leasing or buying several aircraft of the kind owned by Emery. Therefore, Brandewiede was well-positioned to arrange a deal between Emery and Polaris. In July 1987, Brandewiede telephoned Richard Ball, the person responsible for any sale-leaseback of aircraft in Emery's fleet, and told him that he knew of a potential purchaser for some of Emery's aircraft and could arrange a deal. Brandewiede did not give Ball the name of the purchaser at this time. Brandewiede and Ball scheduled a meeting at Emery's then corporate headquarters in Wilton, Connecticut for August 12, 1987 to discuss Brandewiede's proposal.

On August 12, 1987, Ball was unable to meet with Brandewiede and asked Thomas Zuber to attend the meeting. Zuber was Emery's Assistant Treasurer and had been responsible for several prior aircraft sale-leaseback deals. At the August 12th meeting, Zuber confirmed Emery's interest in using its aircraft fleet to pay down the company's outstanding debt, gave Brandewiede a list of the aircraft available for a sale-lease-back transaction, and provided Brandewiede with relevant financial information about Emery. Brandewiede then described his fees and/or commissions for arranging a transaction between Emery and the still undisclosed purchaser. Zuber stated that Brandewiede's fee was acceptable and encouraged him to arrange a meeting between Emery and the undisclosed purchaser in order to determine whether a sale-leaseback transaction was feasible. Zuber later informed Ball about everything that had taken place at the meeting, including Brandewiede's fee.

After the August 12th meeting, Emery sent Brandewiede certain technical and financial information regarding the condition of its fleet, which Brandewiede forwarded to B.W. Baldwin, an officer of Polaris. Brandewiede then sent Zuber a follow-up letter regarding his efforts in arranging a meeting between Emery and Polaris, who was still unknown to Emery. After making numerous telephone calls to Polaris in California and to Emery in Connecticut, Brandewiede set up a meeting between Polaris and Emery to be held on September 10, 1987, which Brandewiede also planned to attend.

Prior to the September 10th meeting, Baldwin asked Brandewiede if he could contact Emery directly regarding the September 10th meeting. Brandewiede agreed and gave Baldwin Ball's telephone number at Emery. Baldwin then called Ball to discuss certain issues regarding the possible sale-leaseback transaction. During that telephone call, Baldwin stated that Polaris would send Emery a written proposal.

After the Baldwin–Ball telephone call and with knowledge that Baldwin had contacted him because of Brandewiede's efforts, Ball called Brandewiede and requested that he not attend the September 10th meeting between Emery and Polaris. Brandewiede complied with Ball's request. At their initial face-to-face meeting in Connecticut, Ball acknowledged to Baldwin that Brandewiede had put Polaris and Emery in contact with each other.

A second meeting was scheduled between Polaris and Emery for October 8, 1987 in

order to negotiate the structure of a sale-leaseback transaction. Brandewiede did not attend this meeting, again in compliance with Ball's wishes. During the meeting, Ball and Baldwin discussed fees owed to Brandewiede for his role in arranging the transaction. Baldwin stated that Polaris did not pay commissions and told Ball that typical finder's fees and commissions ranged from $10,000 to $100,000 per aircraft. At all times Polaris expected Emery to pay Brandewiede's commission.

After the October 8th meeting, when it was clear that a sale-leaseback transaction was taking place, Brandewiede attempted to contact Ball to resolve the precise amount of compensation owed by Emery. Ball, however, denied that Brandewiede had brought Polaris and Emery together for purposes of conducting the sale-leaseback transaction.

A third meeting between Polaris and Emery took place at Emery's Connecticut headquarters on October 29, 1987, during which the parties executed the term sheet regarding the sale-leaseback transaction. Although Baldwin wanted to include Brandewiede's name in the term sheet as broker of record, Ball insisted that the term sheet not include Brandewiede's name and instead read, "[n]either Polaris nor Emery shall be responsible for any brokers' fees or commission incurred by the other party."

The sale-leaseback transaction was finalized in December 1987, and Emery was able to alleviate its debt and avoid seeking relief through bankruptcy proceedings. Although Brandewiede continued to make demands on Emery for payment of his fee pursuant to the terms discussed at the August 12th meeting, Emery refused to pay—other than offering Brandewiede $50,000 to go away. Consequently, Brandewiede filed the instant action to recover his fees.

## Discussion

### Standard for Summary Judgment

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *American International Group, Inc. v. London American International Corp.,* 664 F.2d 348, 351 (2d Cir.1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

After careful review, when resolving all ambiguities and drawing all reasonable inferences against Emery, it is clear that summary judgment must be denied.

### Choice of Law

The threshold issue in this case is whether Connecticut or New York law applies to the alleged oral contract between Brandewiede and Emery. In a diversity case such as this, it is well-established that a district court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941).

Connecticut traditionally has followed a vested rights approach in determining the appropriate choice of law. Thus, the validity and construction of a contract generally are determined by the law of the state of execution or by the law of the state in which the contract is to be performed. *D.P. Technology Corp. v. Sherwood Tool, Inc.,* 751 F.Supp. 1038, 1040 n. 3 (D.Conn.1990); *Teleco Oilfield Services, Inc. v. Skandia Ins. Co.,* 656 F.Supp. 753, 759 (D.Conn.1987); *Grand Sheet Metal Products Co. v. Aetna Cas. & Sur. Co.,* 500 F.Supp. 904, 909 (D.Conn.1980); *Whitfield v. Empire Mutual Ins. Co.,* 167 Conn. 499, 506, 356 A.2d 139 (1975). Where the application of Connecticut law would produce an arbitrary or irrational result, however, Connecticut may follow the Restatement (Second) of Conflicts approach and apply the law of the state with the most significant relationship to the contract. *Galvin v. Newton,* WESTLAW 1991 WL 218485 No. B–88–

597 (WWE) (D.Conn. Sept. 18, 1991); *Economu v. Borg–Warner Corp.*, 652 F.Supp. 1242, 1246–48 (D.Conn.1987), *aff'd* 829 F.2d 311 (2d Cir.1987); *Hoffman v. United Services Automobile Assoc.*, 671 F.Supp. 922, 924 (D.Conn. 1987); *but see Prescott Investors, Inc. v. Blum*, 762 F.Supp. 1553, 1555–56 (D.Conn. 1991) (criticizing Restatement approach); *Icelandic Coast Guard v. United Technologies Corp.*, 722 F.Supp. 942, 948–49 (D.Conn. 1989) (same).

The court finds that application of Connecticut law is appropriate in this case under the vested rights approach. First, the contract was entered into at Emery's corporate headquarters in Connecticut. Second, the contract was performed in and had its operative effect in Connecticut. The purpose of the contract between Brandewiede and Emery was to obtain a buyer for Emery's aircraft. A buyer was obtained and the sale-leaseback transaction took place in Connecticut. Further, the benefits of the contract inured to Emery in Connecticut.

Application of Connecticut law will not produce an arbitrary or irrational result that warrants a deviation from the traditional vested rights approach. All of the meetings that took place regarding the contract between Brandewiede and Emery and the subsequent performance thereof took place in Connecticut. Defendant's corporate headquarters was located in Connecticut at the time of the events in question. On these facts, the application of Connecticut law reasonably could have been anticipated, and Emery cannot claim that application of Connecticut law frustrates its justifiable expectations or is fundamentally unfair. Thus, Connecticut law applies to the contract claims. Similarly, Connecticut law will apply to Brandewiede's third cause of action for fraud and misrepresentation since the relevant statements and acts by Emery were made in Connecticut. The New York Statute of Frauds, therefore, does not preclude this action and summary judgment must be denied as to the contract and tort claims.

## CUTPA

Count four of Brandewiede's complaint alleges that Emery violated the CUTPA, Conn.

Gen.Stat. 42–110g(f), by scheming to deny Brandewiede his rightful commission through false statements, deceit, and misrepresentation of its intentions. Emery contends that Brandewiede is barred from bringing this CUTPA claim for three reasons. First Emery argues that it had an employment relationship with Brandewiede and, therefore, the conduct at issue does not constitute trade or commerce within the meaning of CUTPA. This argument is without merit. Brandewiede's complaint does not allege that any employment relationship formed the basis of his CUTPA claim. Rather, his complaint alleges that Emery committed unfair and deceptive trade practices by scheming to exclude him from its meetings with Polaris on two occasions and to exclude him from the term sheet in the acquisition in order to avoid paying him his rightful finder's fee.

Emery next claims that a single isolated occurrence of unfair trade practices is insufficient to constitute a cause of action under CUTPA, erroneously relying on *Mead v. Burns*, 199 Conn. 651, 509 A.2d 11 (1986). In *Mead*, the plaintiff, who was injured in a car accident caused by an ice covered highway, brought suit against the commissioner of transportation and the state's insurer alleging violations of the Connecticut Unfair Insurance Practices Act (CUIPA) and CUTPA. The court held that a litigant was required to prove more than a single act of insurance fraud to state a claim under CUIPA. Because plaintiff was unable to meet this requirement, the court dismissed the CUIPA claim. At the same time, the court dismissed the CUTPA claim, reasoning that the definition of unacceptable insurer conduct in CUIPA reflects a legislative determination that isolated instances of unfair insurance settlement practices are not so violative of the public policy as to permit a CUTPA cause of action. Thus, *Mead* has no application to the instant action.

■ Finally, Emery argues that Brandewiede's CUTPA claim is barred by the applicable three-year statute of limitations. Conn. Gen.Stat. § 42–110g(f). The wrongful conduct in this case occurred between August and December of 1987. Brandewiede could not have obtained his commission until De-

cember of 1987, since it was based on the successful introduction of Emery to a buyer for its aircraft. The Emery–Polaris acquisition was completed in December, 1987. Because the complaint in this action was brought in November, 1990, it was filed within the three-year statute of limitations. Thus, Emery's motion for summary judgment as to Brandewiede's CUTPA claim must be denied.

## Conclusion

For the reasons set forth above, defendant's motion for summary judgment [45–1] is DENIED.