716 So.2d 104 (1998)
Danatus Norman KING
v.
Phelps DUNBAR, L.L.P. Danny Shaw, Harry Rosenberg and Roy Cheatwood.
No. 97-CA-2519.
Court of Appeal of Louisiana, Fourth Circuit.
June 3, 1998.
*105 Mack E. Barham, Jerry B. Jordan, Travis L. Bourgeois, New Orleans, for Appellant.
Robert E. Kerrigan, Jr., Ellis B. Murov, Charles F. Seemann, III, Deutsch, Kerrigan & Stiles, New Orleans, for Appellees.
Before BARRY, BYRNES and WALTZER, JJ.
BYRNES, Judge.
Plaintiff, Danatus Norman King, brought this action against the law firm of Phelps Dunbar and certain partners, Danny Shaw, Harry Rosenberg, and Roy Cheatwood of that firm, pursuant to LSA-C.C. art. 2315, 2316, 2317 and 2320, as well as LSA-R.S. 23:1006 and LSA-R.S. 51:2231, et seq. On June 24, 1997, the trial court rendered a summary judgment dismissing the plaintiff's claims against the individual defendants. In the same judgment the trial court granted the exception of prescription filed by all of the defendants and dismissed plaintiff's claims against both the individual defendants and the law firm. Plaintiff appeals.
Plaintiff was in the commercial litigation section of the Phelps firm. Plaintiff alleges in his petition that because he is black he was asked to handle cases in the tort and insurance section of the firm because many of those cases could be expected to be tried before predominantly black jurors in Orleans Parish. He also alleges that the defendant Shaw advised him "that the general counsel for the Airport was putting pressure on the firm to hire African-American attorneys for the tort and insurance group, and permit those attorneys to work airport files."
Plaintiff then alleged:
16. Plaintiff once again rejected the transfer to the tort and insurance group, informing Shaw that he would not allow himself to be used as a "black face" for jury or client relations purposes.
17. As a result thereof, a hostile environment became even more hostile. Plaintiff became the target of unwarranted and unjustified attacks on his professional competence; he was accused of being too sensitive regarding racial matters; and he *106 became the recipient of fewer and fewer job assignments....
* * * * * *
20. Plaintiff was reduced to the point of begging for assignments; he even requested assignments from attorneys who were his junior....
21. The Firm's refusal to grant assignments to plaintiff had an adverse effect upon his income, for salary bonuses were predicated upon billable hours. Since plaintiff was not given assignments, he was unable to bill hours and, therefore, was not awarded a salary bonus.
* * * * * *
24. In the latter part of February 1995, plaintiff was informed by three (3) senior partners that his chances of becoming a partner were nonexistent, and that he should consider a career change....
25..... Finally, when he could not tolerate unprofessional, overtly hostile and discriminatory treatment any longer, plaintiff submitted his resignationeffective March 24, 1995.
Plaintiff asserted causes of action against the defendants for discrimination under LSA-R.S. 23:1006 and LSA-R.S. 51:2231, et seq.; for anxiety and emotional distress, including the intentional infliction of severe emotional distress caused by extreme and outrageous conduct resulting in constructive discharge; and for loss of earning capacity arising out of damage to reputation.
At all times relevant to this litigation, former LSA-R.S. 23:1006(B)[1] provided that:
B. It shall be unlawful discrimination in employment for an employer to:
(1) Intentionally fail or refuse to hire, refer, discharge, or to otherwise intentionally discriminate against or in favor of an individual with respect to compensation, terms, conditions, or privileges of employment, because of race, color, religion, sex, or national origin; or
(2) Intentionally limit, segregate, or classify an employee in a way which would deprive an individual of employment opportunities, give a favor or advantage to one individual over another, or otherwise adversely or favorably affect the status of an employee because of race, color, religion, sex, or national origin. Provided, however, that nothing contained herein shall be construed so as to create a cause of action against any employer for employment practices pursuant to any affirmative action plan.
LSA-R.S. 51:2231, et seq., creates the human rights commission and in defining "discriminatory practice in connection with employment" refers back to LSA-R.S. 23:332 (formerly LSA-R.S. 23:1006.). This appeal does not involve proceedings before the human rights commission. Therefore, plaintiff's discrimination claim is basically governed by former LSA-R.S. 23:1006. However, the definition of "employer" to be used in former LSA-R.S. 23:1006 is to be found in former LSA-R.S. 51:2232(4)[2]:
`Employer' means ... any person employing eight or more persons within the state, or any person acting as agent of an employer, directly or indirectly. [Emphasis added.]
Plaintiff's claim relates to two categories of discrimination: (1) Opportunities to do certain work because of race and, (2) the deprivation of opportunity to do work because of race.
The suggestion to plaintiff that he do work that would bring him before black juries and the suggestion that he work for the Aviation Board because that board was seeking black attorneys would fall into the first category, i.e., the opportunity to do certain work because of race. In this category plaintiff was given a favor or advantage not given to other employees, much akin to some affirmative action programs. Former LSA-R.S. 23:1006 B(2) prohibited giving "a favor or advantage to one individual over another." However, the grievance, if any, would lie with the individual from whom the favor or advantage was withheld. The individual, in this *107 case the plaintiff, to whom the favor or advantage is given has no claim under former LSA-R.S. 23:1006 B(2). Therefore, the plaintiff has no claim for employment discrimination because the defendants allegedly offered him certain work opportunities because of race.
However, plaintiff also alleges that he was deprived of other work and opportunities for advancement because of race. Plaintiff implies that the refusal to afford him the type of work he wanted and the opportunities for advancement was designed to pressure him into agreeing to do legal work related to his ethnicity.
This case raises several questions. For example, if it is legitimate for the Aviation Board to request black legal representation, does the fact that the Phelps firm may be motivated by a business purpose rather than a racial purpose change the fact that that business decision may have an illegal racially discriminatory effect? We know that it is illegal for a business to refuse to hire or advance a black employee because a client on customer base of a business expressed a preference for white employees. Former LSA-R.S. 23:1006 B(2) exempts employers for "employment practices pursuant to any affirmative action plan." Does this affirmative action exemption extend to those dealing with an employer who is attempting to further, not its own affirmative action plan, but that of a customer? Or is it limited to the employer with the affirmative action plan? In other words, would the affirmative action exemption apply to the Phelps firm because that firm was dealing with the Aviation Board and the Aviation Board was acting pursuant to an affirmative action plan but the Phelps firm was not? If a client is permitted to seek black representation on an affirmative action basis, but the law firm from which such representation is sought may not assign a black attorney without being guilty of racial discrimination, the law firm faces a very difficult dilemma.
A law firm has the responsibility to provide its clients with the best possible representation. Whenever a firm intentionally selects a black attorney to deal with clients because of race may be a discriminatory act; but as discussed such selection may involve favor and advantage rather than disadvantage and, therefore, not a prohibited employment practice under Louisiana law. It is common knowledge that people believe there are instances when black jurors relate better to a black attorney. Under such circumstances does a firm's duty to provide effective representation for its client make that firm's decision to penalize a black employeeattorney for refusal to undertake such assignments a business decision or racial discrimination? If it would be permissible to penalize an employee-attorney for refusing to undertake reasonable work assignments, Phelps' alleged actions would be permissible if they could be characterized as penalties for Mr. King's refusal to undertake reasonable work assignments rather than raced based penalties. Is it permissible for a law firm to assign a black attorney to work for a client that requests black representation and is it permissible for a firm to assign a black attorney to a case with the expectation that such an attorney will be more favorably received by a black jury?
A careful analysis of plaintiff's allegations, assuming that they are true for purposes of argument only, reveals that he was allegedly denied work and opportunities for advancement because he refused to undertake certain assignments, not because he was black. However, he was requested to undertake those assignments because he was black.

I. SUMMARY JUDGMENT
Plaintiff's petition alleges that the Phelps firm "is an employer within the meaning of former LSA-R.S. 23:1006 and LSA-R.S. 51:2231, et. seq." Plaintiff's petition does not allege that the individual defendants, Shaw, Rosenberg and Cheatwood are employers. Each of the individual defendants filed sworn affidavits attesting to the fact that they are not employers and that it was the firm that employed plaintiff. Therefore, we find no error in the summary judgment dismissal of the claims against the individual defendants to the extent that they are based on former LSA-R.S. 23:1006 and LSA-R.S. 51:2231.
*108 Duplessis v. Warren Petroleum, Inc., 95-1794 (La.App. 4 Cir. 3/27/96); 672 So.2d 1019, cited by the plaintiff, discusses the close parallels between the Louisiana antidiscrimination laws and the related federal laws. Therefore, federal discrimination cases provide guidance to Louisiana courts. U.S. E.E.O.C. v. AIC Security Investigations, Ltd., 55 F.3d 1276 (7 Cir.1995), explains that where discrimination statutes include "and any agent" in the definition of employer the purpose "was to ensure that courts would impose respondeat superior liability upon employers for the acts of their agents." The reference to agents of the employer was not intended to impose individual liability. Cf. Stults v. Conoco, Inc., 76 F.3d 651 (5 Cir.1996). We find the same to be true of the analogous provisions of Louisiana law. The individual defendants herein were not plaintiff's employers and were not "agents" either as that term is used in Louisiana's employment discrimination statutes.
Plaintiff also claims damages for the intentional infliction of severe emotional distress. As a matter of law none of the facts attested to by the plaintiff rise to the level of outrageous conduct necessary to recover for a claim for the intentional infliction of severe emotional distress. Cf. White v. Monsanto, 585 So.2d 1205, 1209 (La.1991); Hammond v. Medical Arts Group, Inc., 574 So.2d 521, 525 (La.App. 3 Cir.1991).
Plaintiff also claims damages because his reputation as an attorney "has been irreparably damaged and, consequently, plaintiff's earning capacity has been reduced." The burden of proof on this issue would be on the plaintiff at the trial on the merits. There is an absence of factual support for this element of the plaintiff's case. Therefore, we find that plaintiff has failed to sustain his summary judgment burden on this issue. LSA-C.C.P. art. 966C(2).

II. PRESCRIPTION
In his deposition of April 24, 1997, the plaintiff testified that when told by Cheatwood, Harry Rosenberg and Brent Barriere[3] on January 20, 1995 that he should make a career change he reacted as follows:
Well, I took it as a comment that you are, this is it for you. You are fired without them saying that you are fired. [Emphasis added.]
At this time plaintiff acknowledges that he was constructively discharged. It is from that date at the latest that prescription on his asserted causes of action began to run. We recognize that in an employment situation where the conditions that lead to such claims as intentional infliction of emotional distress may be cumulative, the first instance of oppressive treatment may not trigger prescription. The employee may harbor hopes that conditions will improve. But in this case there is a defining moment on January 20, 1995 when even the plaintiff recognized that it was all over, so to speak. Although plaintiff did not actually leave until two months later, plaintiff's own testimony leaves no doubt that he treated the meeting of January 20, 1995 as tantamount to notification of discharge. Cf. Winbush v. Normal Life of Louisiana, Inc., 599 So.2d 489, 491 (La.App. 3 Cir.1992), in which the court stated that "the prescriptive period commences to run from the date of notification of the discharge, rather than the date of discharge." As all of the claims he asserted were delictual in nature[4], it was necessary that they be filed within one year of January 20, 1995. Plaintiff did not commence this litigation until March of 1996. By then his claims had prescribed. We find no error in the trial court's granting of the Phelps firm's exception of prescription.
The third circuit refused to follow Winbush in Harris v. Home Sav. and Loan Ass'n, 95-223 (La.App. 3 Cir. 7/27/95); 663 So.2d 92. In Harris the plaintiff brought a claim for age discrimination. He was told that when a replacement could be found he would be replaced. That did not occur until over a year later, at which time he was *109 terminated by the company. The Harris court rejected the argument that prescription commenced on the date that the plaintiff was informed that he would eventually be terminated. In Harris what the plaintiff received was not a specific notice of termination such as occurred in Winbush and Williams v. Conoco, Inc., 860 F.2d 1306 (5 Cir.1988), but a vague and indeterminate notice informing him only that if and when a replacement could be found he would be replaced. As it was, this process took over a year and could well have taken far longer. This is very different from receiving something definite like two weeks notice. Cf. Economu v. Borg-Warner Corp. 829 F.2d 311 (2 Cir. 1987). As the Harris court noted, the intent to terminate Mr. Harris could easily have been annulled before the actual termination. As Louisiana is an employment at will state, at a time when no termination was definitely on the horizon, Mr. Harris cannot be blamed for postponing his litigation with its attendant risk of immediate termination until after he was actually terminated. By way of contrast, in Williams the plaintiff was given a written notice in late November of 1986, terminating her employment effective December 31, 1986. There was nothing uncertain about that termination. The Williams court held that the one-year prescriptive period commenced on the date she received notice in November, not the date of her last day of employment on December 31, 1986.
We agree with the result in Harris. However, we do not agree with Harris `criticism of Winbush and Williams because those two cases are factually distinguishable from Harris. The Harris court seemed to feel the need to explain away what it erroneously perceived to be inconsistencies between its decisions and the decisions in Winbush and Williams, but the factual differences in Winbush and Williams on the one hand and Harris on the other mean that there is no inconsistency of result. There were notices of definite terminations in Winbush and Williams, but not such definite notice in Harris. Therefore, we find the Harris criticism of Winbush and Williams based on Harris ` misperception of non-existent inconsistencies to be without foundation.
Likewise, we do not agree with language in Brunett v. Dept. of Wildlife & Fisheries, 96-0535, 96-0536 (La.App. 1 Cir. 12/20/96); 685 So.2d 618, finding that the plaintiff's cause of action for age discrimination commenced not on the date of the notice of his layoff (November 14, 1988), but on actual layoff date of January 2, 1989. Brunett relied on the faulty reasoning in Harris in reaching this result. Moreover, the Brunett court also noted that the plaintiff became "absolutely convinced" that he had been discriminated against only on the date of his actual termination. In the instant case the plaintiff was convinced long before his "constructive discharge" that he was the victim of discrimination.
Additionally, in the instant case we are dealing with a claim of constructive discharge which is subjective in nature. In constructive discharge situations, the employee's employment is not actually terminated by the employer. An employee is constructively discharged when the employer discrimination creates working conditions that are so intolerable that the employee feels compelled to resign. Therefore, being subjective in nature because it is based on the plaintiff's perception of what is intolerable, constructive discharge occurs when the plaintiff deems it to have occurred. In the instant case that would be January 20, 1995. Plaintiff's testimony is unequivocal that on that date he considered himself constructively discharged and he was, in the words of Brunett, "absolutely convinced" of the discriminatory basis of that discharge. Based on the facts of the instant case, there is nothing in Harris or Brunett that would persuade us not to apply Winbush and Williams. Accordingly, we find that the effective date of plaintiff's notice of constructive discharge was January 20, 1995, and that prescription should be calculated from that date. The filing of this suit by the plaintiff in March of 1996 came too late.
For the foregoing reasons the judgment below is affirmed in its entirety.
AFFIRMED.
NOTES
[1] Subsequently repealed by Act 1409 (effective August 1, 1997) and superseded LSA-R.S. 23:331 et seq.
[2] Repealed in 1997.
[3] Mr. Barriere has not been made an individual defendant in this case.
[4] In addition to the delictual claims for the intentional infliction of emotional distress and damage to reputation and earning capacity, the claims under LSA-R.S. 23:1006 and LSA-R.S. 51:2231, et seq., are also considered to be delictual in nature. Winbush v. Normal Life of Louisiana, 599 So.2d 489, 491 (La.App. 3 Cir.1992).