**Loren SMITH, Plaintiff–Appellant,**

v.

**UNITED PARCEL SERVICE OF AMER-ICA, INC., d/b/a United Parcel Service, Inc., Defendant–Appellee.**

No. 1741, Docket 94–9308.

United States Court of Appeals,
Second Circuit.

Argued May 23, 1995.

Decided Sept. 8, 1995.

Rachel J. Minter, New York City, for plaintiff-appellant.

Aaron J. Schindel, New York City (Proskauer Rose Goetz & Mendelsohn LLP, Monique A. Tuttle, of counsel), for defendant-appellee.

Before: VAN GRAAFEILAND, KEARSE and WALKER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

■ The Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, became effective on July 26, 1992. *See* Pub.L. No. 101–336, § 108, 104 Stat. 327, 337 (1990). The Act was not retroactive. *O'Bryant v. City of Midland,* 9 F.3d 421, 422 (5th Cir. 1993). The issue in the instant case is whether Loren Smith was discharged by his employer, United Parcel Service of America, Inc. ("UPS"), for medical reasons before or after the Act's effective date. The district court (Martin, J.), finding no genuine dispute as to this material fact, granted UPS's summary judgment motion based on the first alternative and dismissed Smith's complaint alleging violation of the Act. Because we conclude that there is a triable issue of fact concerning the date of discharge, we vacate and remand.

Smith was employed by UPS for approximately twenty-four years and had obtained the position of supervisor. Towards the end of his employment, he suffered from two disabilities, coronary artery disease, which was diagnosed after he suffered a heart attack in 1988, and diabetes. As a result, he required certain accommodations from his employer, e.g., limitations on lifting heavy objects, regular meal breaks, and the ability to test blood sugar levels at work, which he

contends were not afforded him. However, these alleged failures took place before ADA's effective date and are not the subject of this action.

Although Smith always had received satisfactory evaluations prior to his 1988 heart attack, he received only unsatisfactory appraisals thereafter. In the Spring of 1992, Smith's superiors began a series of meetings to discuss his performance. The first meeting, in early May, was between Smith and his immediate superior, Martin Brennan. Its purpose was to discuss Smith's first-quarter appraisal, which was unsatisfactory. The second meeting, held on May 27, included Brennan and Brennan's superior, Sal Messina. At this meeting, Messina told Smith "that [his] performance was unacceptable, [and] that they wanted [him] to go home and think about [his] future with the company." Smith says that "this [was] the kind of thing they say at UPS when they want you to leave—UPS shorthand for 'we want your resignation.'" Although Smith's superiors did not say explicitly that Smith was terminated, he went home that day and never returned to work.

Another meeting took place on June 2, 1992, this time with Messina and District Human Resources Manager Michael Johnson. Again, the focus was on Smith's poor performance. He was told that he "wasn't carrying [his] weight," and that he "should leave" the company. A final meeting took place on June 19, with Johnson and District Manager Lea Soupata, the highest ranking officer in the district, in attendance. According to Smith, Soupata stated that "there comes a time when you have to move in new directions," that "there comes a time when, through no fault of either party, ... there should be a separation of the ways," and that "[Smith] had to consider what was best for [him], and perhaps continuing with UPS was not what was best for [him]." Also at this meeting, Smith was handed some papers apparently relating to termination. Although he was told he "should sign them," he stated that he first wanted to consult with a lawyer.

Smith took the papers to his attorney, who wrote to Johnson stating in substance that if UPS was sincere in its expressed desire to resolve amicably Mr. Smith's departure and obviate the need for any legal action, some further discussion clearly would be necessary. Between June and September, Smith's attorney negotiated with the UPS attorney in an ultimately unsuccessful attempt to resolve the terms of Smith's cessation of employment. In the meantime, Smith remained on the payroll, although he did not report to work.

On September 23, 1992, Johnson sent Smith a letter which read in pertinent part as follows:

The purpose of this letter is to review where we stand in regards to your employment status with United Parcel Service.

Since our last meeting on June 19, 1992 we have been attempting to reach a mutually acceptable agreement with you. During this period we have continued to provide you with full salary and benefits.

Since our efforts have proven to be unsuccessful we will subsequently terminate your employment with United Parcel Service effective the date of this letter, September 23, 1992.

You will be paid through September 30, 1992 and your benefits will be effective through October 31, 1992. You will then be eligible for COBRA benefits, which I've included with this letter, along with:

· A Thrift Plan Withdrawal Form

· Unemployment Application Form

· Thrift Plan and Retirement Plan Summaries

You will be contacted by Shareholders Relations regarding your UPS and OPL Shareholdings. You will also be contacted by Corporate Benefits regarding your Deferred Vested Retirement Benefit as soon as it is processed.

Please forward to me the following items:

· UPS Identification Card

· Blue Cross and Paid Prescription Cards

· Any UPS keys, uniforms, policybook, etc.

You may forward these items to: [Address]

If you have any questions please contact Mr. Irvin Winston who is replacing me as the Human Resources Manager in Central New York.

Smith subsequently commenced the instant action alleging discrimination under the ADA. UPS moved for summary judgment on the ground that Smith's employment had terminated prior to the effective date of the Act. Smith now appeals from the grant of this motion.

The district court stated that "[t]he definition of what constitutes notice of termination is controlled by two Supreme Court decisions: *Delaware State College v. Ricks,* 449 U.S. 250, 259, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980), and *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (per curiam)." These cases involved statutes other than the ADA—viz. Title VII and 42 U.S.C. § 1981 in *Delaware;* 42 U.S.C. § 1983 in *Chardon.* Moreover, unlike the instant case, the principal issue in the two Supreme Court cases was what conduct on the part of the defendant started the running of the statute of limitations, i.e., on what date the employee could bring suit. Because Smith could not sue UPS for violating the ADA before that statute's effective date, these cases are not on all fours with the instant one. However, it is proper that they be considered. In *Delaware,* college trustees notified a professor on June 26, 1974 that he would not be granted tenure and would receive a one-year terminal contract expiring on June 30, 1975. 449 U.S. at 252–54, 101 S.Ct. at 501–02. The Court held that the alleged discrimination occurred when the terminal decision was made and communicated to the professor, not when the professor ceased working. *Id.* at 258, 101 S.Ct. at 504. The issues in *Chardon* were similar to those of *Delaware,* and the Court majority applied the *Delaware* holding in the following language that is pertinent to the issues now before us:

On dates prior to June 18, 1977, each respondent was notified by letter that his appointment would terminate at a specified date between June 30 and August 8, 1977.

454 U.S. at 7, 102 S.Ct. at 28.

We think *Ricks* is indistinguishable. When Ricks was denied tenure, he was given a 1–year "terminal" contract. Thus, in each case, the operative decision was made—and notice given—in advance of a designated date on which employment terminated.

*Id.* at 8, 102 S.Ct. at 29.

Following a decision to terminate, the actual ending of employment was deferred to a designated date.

*Id.* at 8 n. 2, 102 S.Ct. at 29 n. 2.

 Thus, the limitation period begins to run " 'on the date when the employee receives a definite notice of the termination.' " *See Economu v. Borg–Warner Corp.,* 829 F.2d 311, 315 (2d Cir.1987) (quoting *Miller v. International Telephone & Telegraph Corp.,* 755 F.2d 20, 23 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985) (citation omitted)). *See also Sharpe v. American Express Co.,* 689 F.Supp. 294, 297 (S.D.N.Y.1988); *Hale v. New York State Dep't of Mental Health,* 621 F.Supp. 941, 942 (S.D.N.Y.1985).

Moreover, for the notice to be effective, it must be made apparent to the employee that the notice states the "official position" of the employer. *See Economu, supra,* 829 F.2d at 315 (citing *Delaware, supra,* 449 U.S. at 262, 101 S.Ct. at 506).

Concluding that the above principles can be applied in the instant case despite the fact that a different statute is involved, we hold that the admonitions to Smith that antedated July 26, 1992 cannot as a matter of law be considered "definite notices of termination" and statements of UPS's "official position."

So far as we know, Smith's employment was an employment at will, which, under New York law, was terminable at any time at the option of either Smith or UPS. *See Town & Country House & Home Serv., Inc. v. Newbery,* 3 N.Y.2d 554, 561, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958). If there were proper reasons for discharging Smith, this could have been accomplished simply and directly. We hold that it was for a jury to determine whether the suggestions concerning resignation at issue herein should be treated as notices of discharge.

We vacate the summary judgment on appeal and remand to the district court for a jury trial.

WALKER, Circuit Judge, concurring:

I concur in the majority opinion. I write separately only to explain my understanding on one point of the majority's analysis.

New York has adopted the common law rule that "an employment relationship is presumed to be a hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333, 506 N.E.2d 919, 920, 514 N.Y.S.2d 209, 211 (1987). Nonetheless, the relationship is still a contractual one. Although an action for breach cannot ordinarily be maintained unless the parties have expressly modified the at-will presumption, *see Lerman v. Medical Assocs.*, 160 A.D.2d 838, 839, 554 N.Y.S.2d 272, 273 (1990), the terminating party is still required to notify the other party, either by words or by actions, that the employment relationship has ended, *see, e.g.*, Cal.Lab. Code § 2922 ("An employment, having no specified term, may be terminated at the will of either party on notice to the other."); *cf. Town & Country House & Home Serv. v. Newbery*, 3 N.Y.2d 554, 561, 147 N.E.2d 724, 728, 170 N.Y.S.2d 328, 334 (1958) (holding that *advance* notice is not required). Smith's claim in this action is that UPS's decision to terminate him was in violation of the ADA, and therefore, the key date is when he was terminated. Because termination requires notice (but not advance notice), that date could not be prior to when UPS informed him that the employment relationship had ended.

The date notice is received will not be the operative date in every case in which the date of a discriminatory act is at issue. For instance, a decision to deny tenure, such as that made in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), does not require notice to be effective, and occurs at the date it is made, *see Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981) (per curiam), not when the applicant is notified of the decision. Of course, as the Supreme Court made clear in *Ricks*, the statute of limitations does not begin running until notice is given. *Ricks*, 449 U.S. at 261–62, 101 S.Ct. at 505–06. However, the issue in a case like this one is not the date of the act which triggers the running of the limitations period, but rather, the date on which the allegedly discriminatory act took place. When the alleged discriminatory act is a termination, these dates will probably always coincide. But in the context of other employment decisions that are effective without regard to the receipt of notice, the date of the discriminatory act and the date on which the statute of limitations begins to run will often differ.