KENNEDY

v.

**ST. FRANCIS HOSPITAL, et al.**

**No. 3:00 CV 604(JBA).**

United States District Court,
D. Connecticut.

Aug. 22, 2002.

130

Francis A. Miniter, Brian D. Smith, Christine E. Corriveau, Miniter & Associates, Hartford, CT, Paul Mpande Ngobeni, E. Hartford, CT, for Plaintiff.

Dana R. Baughns, Updike, Kelly & Spellacy, P.C., Hartford, CT, Joseph A. Rosenthal, Updike, Kelly & Spellacy, P.C., New Haven, CT, Bernard E. Jacques, Pepe & Hazard Goodwin Square, Hartford, CT, for Defendants.

### Ruling on Motion for Summary Judgment [Doc. # 37]

ARTERTON, District Judge.

Beverly Haskins Kennedy brings this suit under 42 U.S.C. § 1981[1] against her former employer and several co-workers alleging that race discrimination motivated her September 1992 discharge, when her job was ostensibly eliminated. Kennedy, who is white, claims that she was not aware of defendants' race-based motivation until August 1999, when she obtained a 1992 memorandum discussing the creation of a new position similar to hers, for which an African woman was to be considered. She also alleges defendants violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), by failing to permit her to return to work with accommodations after she was sufficiently recovered from injuries, discriminatorily terminating her employment, and discriminatorily failing to rehire her. Finally, she alleges retaliation under § 1981 and the ADA for complaining of this alleged discrimination, and a state common law claim of intentional infliction of emotional distress related to, *inter alia,* the manner in which defendants' agents allegedly investigated her worker's compensation claim.

Defendants have moved for summary judgment on all claims, asserting that Kennedy's suit is time-barred, or in the alternative, otherwise lacks triable merit. For the reasons set out below, defendants' motion is granted in part and denied in part. Defendants are entitled to summary judgment on all of Kennedy's claims except her ADA claims that she was improperly not allowed to return to work in her final two months of employment and that she was improperly not considered for the coordinator position.

### I. Factual Background

#### A. Kennedy's Employment with St. Francis

In October 1988, a new position of program director was created at Saint Francis Hospital's Sickle Cell Service ("SCS"). SCS had previously consisted of four employees: a medical director, social worker, nurse, and secretary. After several candidates were interviewed, Kennedy was hired for the position.

Kennedy sustained an injury in June 1991 and was on a medical leave from November 1991 until February 1992. In late 1991 or early 1992, Frederick Berrien, the medical director of SCS and Kennedy's supervisor, determined that SCS should be reorganized and the program director position should be eliminated. Kennedy was informed in March 1992 that her position was being eliminated as of September 1992.

In May 1992, an internal memorandum written by Berrien proposed the creation of a new position with a more clinical focus. The position, which was never filled, was described as a "reconfiguration" of the program director position that was being eliminated. Unbeknownst to Kenne-

---

**1.** "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens[.] For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a) and (b).

dy, Berrien proposed that Victoria Odesina, a Nigerian woman, be offered the new clinical coordinator position without any posting. The Memorandum states:

1. Since the Coordinator position is a reconfiguration of the Program Director (previously regarded as .5 FTE) does this require budget committee approval.

2. Presuming that Victoria Odesina wants the Coordinator position, can we simply elevate her to that position without opening up the recruitment?

3. If Victoria does take the Coordinator position, the current position (Newborn Screening Coordinator / Health Educator) that she occupies would become a .5 FTE RN position. However, if a social worker were to occupy the Coordinator position we would have need of a 1.0 FTE RN and only .5 FTE social worker. How do we proceed?

(This is ignoring the possibility that Beverly gets her way with the Human Rights Commission and she ends up in the job.)

Def.'s Mot. Summ. J. [Doc. # 37] Ex. G.

Kennedy suffered a second work-related injury in May 1992, and she was again on medical leave from May 29, 1992 to August 1992. When she attempted to return to work from her second disability leave on August 3, 1992, she was denied medical clearance. After September 30, 1992, Kennedy's position was eliminated as had been previously planned, and SCS was again composed of four employees, as it had been before the October 1988 creation of Kennedy's position.

Kennedy commenced this suit on March 31, 2000.

## B. Kennedy's Allegations

The central element of Kennedy's claims is her discharge and the alleged "pre-selection" of Odesina for the coordinator position. Kennedy appears to be claiming that the memorandum shows that her position was not actually eliminated, and instead she was fired with St. Francis intending all along to give her job to Odesina. While Kennedy was not aware of the memorandum or the pre-selection, the record reflects that she was aware of a potential new position.[2] Although the new position was never created, Kennedy argues that her discharge was improperly motivated by her race and disability in that Odesina was selected to be her replacement and that St. Francis failed to consider her for the coordinator position. She also alleges that St. Francis sent back state funding for the position in order to avoid having a position for which she could apply.

Kennedy claims that a racially-charged atmosphere existed at St. Francis. When she was interviewed in 1988, one of the interviewers "asked me what she would say to her black sorority members when they found out that they hired a white woman to be the director of the sickle cell program." Kennedy Dep. at 52. She claims that she was "mistreated in ways in which my non-disabled and non-white co-workers were not." Kennedy Aff. ¶ 16. Specifically, her supervisor Keith Alexander called her home during one of her medical leaves and spoke with her seventeen year old son about her medical condition, breaching her confidentiality and frightening her son. When her secretary

---

**2.** *See* Kennedy Dep. at 43 (" .. I had told Dr. Berrien that I would apply for the job if it was posted or advertised ... "); Berrien Aff. ¶ 18 ("Both orally and in writing I told plaintiff that she could apply for the clinical service coordinator's position.").

(who was African American) and two other employees took leaves of absence, no one called their homes to inquire.

Kennedy asserts that in an October 1991 employment evaluation her score was lowered from 169 to 163, and that no other employees of SCS had their score lowered in a similar fashion. She also claims that when she was on medical leave, the staff would not keep her updated or as well informed as others on medical leave. Additionally, she asserts that she was put under surveillance by St. Francis in connection with her worker's compensation claims, with investigators making intrusive personal inquiries of her friends and business associates. Finally, she asserts that St. Francis failed to reasonably accommodate her disability after her return from her first leave of absence in February 1992 and failed to clear her to return to work in August 1992, all in violation of the ADA.

## II. Analysis

### A. Standard

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party") (citation omitted).

When deciding a motion for summary judgment, " 'the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R.Civ.P. 56(e).

### B. § 1981 Claims

■ Kennedy asserts that her discharge, failure to be considered for the newly-created position, and certain treatment she experienced during and immediately after her employment at St. Francis constitutes race discrimination under § 1981. Defendants argue that because the decision to eliminate her position, as well as other alleged race-based disparate treatment during and after her tenure at St. Francis, all took place more than three years before suit was commenced, Kennedy's § 1981 claims are time-barred. In opposition, Kennedy argues that her suit is timely because defendants fraudulently concealed the true reason for the elimination of her position and that it was not until she obtained a copy of the 1992 Berrien memorandum in 1999, that she was aware of defendants' race-based motivation.

■ "Since there is no specifically stated or otherwise relevant federal statute of

limitations for a cause of action under § 1981, the controlling period would ordinarily be the most appropriate one provided by state law," *Johnson v. Railway Exp. Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (citations omitted), which is three years in Connecticut, *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 131 (2d Cir.1996). Inasmuch as the last act claimed as a basis for the § 1981 claim allegedly occurred in 1996 [3] and suit was not commenced until 2000, all of Kennedy's claims are time-barred absent some form of tolling or delayed accrual.

Asserting that defendants' alleged fraudulent concealment of the Berrien Memorandum warrants equitable tolling,[4] Kennedy claims that her claim did not accrue until she had reason to know of the race-based motivation or, alternatively, that the statute of limitations should be equitably tolled. While there remains uncertainty in this Circuit as to whether allegations of fraudulent concealment are questions of accrual (governed by federal law) or tolling (governed by state law), "the more likely alternative" is that "concealment of a cause of action ... is one of the state 'tolling rules' we are to borrow." *Pearl v. City of Long Beach,* 296 F.3d 76,

83–84 (2d Cir.2002).[5] However, as in *Pearl,* Kennedy's claims are not saved by application of either federal or state law on fraudulent concealment.

The Second Circuit has explained the substantial challenge facing a plaintiff who seeks to invoke the doctrine of equitable tolling:

Although we have broadly stated ... that we will apply the equitable tolling doctrine "as a matter of fairness" where a plaintiff has been "prevented in some extraordinary way from exercising his rights," *Miller v. International Telephone & Telegraph Corp.,* 755 F.2d 20, 24 (2d Cir.1985), we made it clear that we had in mind a situation where a plaintiff "could show that it would have been *impossible* for a reasonably prudent person to learn" about his or her cause of action. *Id.* (emphasis added); *see Johnson v. Nyack Hospital,* 86 F.3d 8, 12 (2d Cir.1996).

*Id.* at 85. "In applying the doctrine of equitable tolling, we have made an important distinction between fraudulent concealment of the existence of a cause of action and fraudulent concealment of the facts that, if known, would enhance a plaintiff's ability to prevail as to a cause of

**3.** Most of the facts underlying Kennedy's race discrimination allegations occurred during her employment at St. Francis, which ended in September 1992. However, Kennedy ascribes a racial motivation to St. Francis's alleged failure to consider her for the coordinator position for which Odesina was preselected, and asserts that in September 1993 St. Francis sent back "over $50,000" in state funding to eliminate any possibility of the position being created, to prevent her from competing for the position. Kennedy Dep. at 66. Additionally, she asserts that "[a]round 1996 ... Defendants once again asked Odesina to develop and finalize the job description of the Coordinator position." Kennedy Aff. ¶ 14(E); *accord* Odesina Aff. ¶ 4 ("On or about late 1996 ... [I] was offered ... the position of Clinical Service Coordinator and

asked ... again to develop a job description."). The record contains no evidence of any allegedly discriminatory act after 1996.

**4.** Plaintiff does not rely on the doctrines of continuing violation or equitable estoppel, or any theory that the pendency of the ADA claims tolled the period for commencing the § 1981 claims. Pl.'s Mem. Opp. Summ. J. [Doc. # 43] at 9–10.

**5.** While *Pearl* relied on other § 1983 cases, the rationale used by courts to determine the timeliness of actions under both § 1981 and § 1983 is analogous. *See Goodman v. Lukens Steel Co.,* 482 U.S. 656, 660–662, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1982); 42 U.S.C. § 1988 (applicable to both § 1981 and § 1983 claims).

action of which the plaintiff was already aware." *Id.* at 84 (*citing Paige v. Police Department of Schenectady*, 264 F.3d 197, 200 (2d Cir.2001)).

 Connecticut law of fraudulent concealment is similar, if not more exacting. The plaintiff must show by "clear, precise, and unequivocal evidence": (1) defendant's actual awareness, not imputed knowledge, of the facts necessary to establish the plaintiff's cause of action; (2) defendant's intentional concealment of these facts from the plaintiff; and (3) defendant's concealment of the facts for the purpose of obtaining delay on the plaintiff's part in filing a complaint on her cause of action. *Bartone v. Robert L. Day Co., Inc.*, 232 Conn. 527, 533, 656 A.2d 221 (1995) (citations omitted). "The defendants' actions must have been directed to the very point of obtaining the delay in filing the action of which they afterward seek to take advantage by pleading the statute." *Bound Brook Ass'n v. Norwalk*, 198 Conn. 660, 666, 504 A.2d 1047 (1986) (citations and internal quotations omitted).

 Here, Kennedy was undisputedly aware in March 1992 that her employment with St. Francis was terminated, effective September 30, 1992. She was aware of her racially disparate treatment from the inception of her employment, and her explanation of why the Berrien memorandum, which makes no reference to Kennedy's or Odesina's race, is evidence of racial motivation derives from her past experience at St. Francis:

Q: And how do you know that Ms. Odesina was selected for the position because of her race?

A: Victoria was—they planned to put Vicki in that position and elevate her to the clinical coordinator's position, basically because they questioned whether a white woman really could manage a program like that

or be effective. During my interview process I was asked [by one board member what she] would say to her black sorority members when they found out that they hired a white woman to be the director of the sickle cell program.

\*　　\*　　\*　　\*　　\*　　\*

Q: What information do you have that Ms. Odesina was preselected for this position because of her race?

A: Ms. Odesina is African. In the program at that time I was the program director, Dr. Berrien the clinical director was white as well .... It had been the feeling of people associated with the program that there needed to be African or African American people who were visible in the program. [T]hey obviously felt it was important that she be African.

Kennedy Dep. at 51–52.

The new Berrien Memorandum at most provides additional evidence to bolster Kennedy's view that she was disadvantaged by being white in a medical program focused on an affliction predominantly suffered by African Americans, which she ascribes as the race-based motive for her discharge and alleged non-consideration for the new position. Thus, the alleged concealment of the memorandum would not have made it "impossible for a reasonably prudent person to learn that [her] discharge was discriminatory," *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir.1985), or that discrimination motivated St. Francis's alleged failure to consider her for the new position. Similarly, under Connecticut law, plaintiff has failed to show that defendants concealed "facts *necessary* to establish the plaintiff['s] cause of action," *Bartone*, 232 Conn.

at 533, 656 A.2d at 225 (emphasis added), as opposed to confirmatory evidence.

Given the inapplicability of the doctrine of equitable tolling, all of Kennedy's § 1981 claims are time-barred.

## C. Disability Discrimination

Kennedy alleges that she was unlawfully discharged and refused accommodation in violation of the ADA. Defendants assert that Kennedy's claims pre-date the effective date of the ADA, and are thus not cognizable.[6] In response, Kennedy asserts that at least part of her disability discrimination claim is based on conduct postdating the ADA's effective date.

### 1. Pre July 26, 1992 Claims

■ The ADA, enacted in 1990 and effective on July 26, 1992, Pub.L. No. 101–336, § 108, 104 Stat. 327, 337, does not apply retroactively to conduct before its effective date. *Smith v. United Parcel Service*, 65 F.3d 266, 266 (2d Cir.1995). The evidence is undisputed that Kennedy was informed in March 1992 that her employment was to be terminated as of September 30, 1992. The date on which a wrongful termination claim accrues is the date on which the employee receives definite and official notice of her termination. *See id.* at 268. Since Kennedy received such notice of her termination prior to the effective date of the ADA, her termination is not actionable under the ADA. *See id.* Similarly, Kennedy's claims of disability

discrimination based on her performance evaluation of October 1991, the call to her home in January 1992, and St. Francis's alleged failure to accommodate her disabilities upon return from her leave of absence in February 1992 are also based on conduct occurring prior to the effective date of the ADA, and are thus not cognizable.[7]

### 2. Post July 26, 1992 Claims

#### a. Perceived Psychological Disability

■ Kennedy asserts that when she attempted to return from her second disability leave on August 3, 1992, she was denied medical clearance to return to work based on St. Francis's physician's "stereotypical views" about the work abilities of people with disabilities. She asserts that by not allowing her to return to work for her final two months of employment, defendants violated the ADA.

Defendants aver that they have a policy requiring all employees to be cleared for return to work from a medical leave of absence by a physician specializing in occupational health, in order to determine whether the employee can return without risk of injury to the employee or the Hospital's patients. Kennedy had had two medical leaves in one year. The first injury, resulting from a fall in a grocery store, resulted in a four month absence. The second injury, sustained in an automobile accident, resulted in her absence for two

---

**6.** Defendants also contend that plaintiff's original filing with the CHRO, which alleged disability discrimination under state law, was never amended to include a claim under the ADA. Def.'s Reply [Doc. # 52] at 7. This is incorrect: plaintiff's first amendment on February 3, 1993 specifically alleges an ADA violation. *See* [Doc. # 37] Ex. D (bates stamp # 1056).

**7.** Kennedy's affidavit shows that the conduct forming the basis of her February 1992 fail-

ure to accommodate claim ended prior to July 26, 1992 in that she asserts that the accommodation she required post-February was "flexible or part time work schedules, an ergonomic chair and lifting restrictions." Kennedy Aff. ¶ 7. Since Kennedy was out of work due to a worker's compensation injury from May 29, 1992, id. ¶ 9, the need for such accommodations was mooted by her second medical leave.

months.[8] Dr. Kaiser, an occupational health physician retained by the defendants to assess Kennedy's request to return from her second leave, wrote that Kennedy's symptoms were

> compatible with two pre-existing conditions, scoliosis with subsequent extensive back surgery, and an ill-defined autoimmune disorder, and back and leg pain due to one or both of these conditions, with subsequent trauma causing exacerbation of syndrome and underlying disorders contributing to more serious sequelae from trauma than would otherwise be the case . . . .

Def.'s Mot. Summ. J. [Doc. # 37] Ex. J (notes of Dr. Kaiser). Based on her conclusion that Kennedy's ailments were not wholly physical or organic, and instead had a mental or "psychologic" component, Kaiser refused to clear Kennedy to return to work on August 3, 1992 until she had consulted with all of Kennedy's other physicians.[9] In a September 15 entry on Kennedy's chart, Kaiser explained:

> [A]ny organic/physical problems she might have from the trauma in question [are] present because of her underlying

autoimmune disease and would not be present absent that disorder. I also believe that there is a large psychologic overlay which make[s] it hazardous for her to be in a hospital environment right now, as she has stated several times that she is afraid that she'll fall while walking in the hospital [especially] on stairs, and will be severely injured.

*Id.* Dr. Kaiser's treatment notes indicate that as of August 24, she still had not completed her efforts to contact all of Kennedy's physicians.

■■■ The ADA prohibits discrimination based on perceived disability. *Francis v. City of Meriden,* 129 F.3d 281, 283 (2d Cir.1997) (the ADA "extends its protection to discrimination against those whom an employer perceives, even mistakenly, to have a disability"). In their motion for summary judgment, defendants rely on their policy mandating a physician's clearance to return to work, arguing in effect that any delay in returning Kennedy to her position was reasonable. *See* Def.'s Mem. Supp. Summ. J. [Doc. # 39] at 29.[10] Taking all inferences in Kennedy's favor and assuming that Kennedy was in fact

---

8. It is undisputed that Kennedy required medical leave through June and July 1992; the dispute arises as to whether she should have been allowed to return to work from the beginning of August through the date her doctor certified her to be temporarily totally disabled, *see infra* note 12.

9. Kennedy Dep. II at 11.

10. For the first time in their reply brief, defendants raise the issue of whether Kennedy was a qualified individual with a disability under the ADA, and claim that Kennedy never notified them of what accommodations she required. As this argument was not raised in defendants' original motion, Kennedy had no opportunity to respond, and summary judgment on this basis is improper. *See* D. Conn. L. Civ. R. 9(g) (reply briefs "must be strictly confined to a discussion of matters raised by

the responsive brief"); *Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir.1993) ("Arguments may not be made for the first time in a reply brief.").

In the absence of an assertion by defendants in the original motion that no genuine issue of material fact exists as to whether Kennedy was a qualified individual with a disability, Kennedy was under no obligation to come forward with evidence of her qualification. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.") (*quoting* Fed.R.Civ.P. 56(c)).

capable of returning to work on August 3,[11] a jury could reasonably conclude that defendants erroneously regarded Kennedy as having a psychological problem, and that based on this perceived disability, she was denied the opportunity to return to her job when she was medically able to work.

▇▇▇ The record here is of a five week delay.[12] The Court cannot conclude as a matter of law that defendants' significant delay in returning Kennedy to work, justified only by a blanket reference to their policy of requiring all employees to be cleared by an occupational health specialist, complied with the ADA's requirements, especially given the interactive process contemplated by the ADA in which "employers and employees work together to assess whether an employee's disability can be reasonably accommodated," *Jackan v. New York State Dept. of Labor*, 205 F.3d 562, 566 (2d Cir.2000) (*citing Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996) and 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.")).

### b. Consideration for Coordinator Position

▇▇▇ Kennedy asserts that disability discrimination motivated defendants' failure to consider her for the Coordinator position for which Odesina is alleged to have been pre-selected. Defendants point out that the proposed position was never created,[13] meaning that Kennedy's claim is one for failure to be considered for a position that never existed. Further, they argue that Berrien specifically envisioned the position as one with a clinical focus, and that Berrien's review of Kennedy's resume led him to believe that she lacked such clinical experience.[14]

The familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of*

---

**11.** *See* Kennedy Dep. at 86 (Kennedy's private physician cleared her for return to work in August).

**12.** In their motion for summary judgment, defendants assert that Kennedy's request to return to work was withdrawn on September 11, 1992 (five weeks from when Kennedy first attempted to return to work), pointing to an entry on Kennedy's private physician's letterhead that states that Kennedy was "temporarily totally disabled … until further notice." Def. Mot. Summ. J. Ex. K. Although no further context is given, Kennedy's opposition to summary judgment never addresses the issue. Inasmuch as the defendants have discharged their burden by "pointing out to the district court … that there is an absence of evidence to support the nonmoving party's case," *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548, plaintiff had an obligation to make some showing that she was able to return to work despite her private physician's conclusion that she was "temporarily totally disabled." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *cf. also Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1048 (6th Cir.1998) ("[a plaintiff] not released by her [own] doctor to return to work … has not met the second requirement that she be qualified to perform the essential functions of the job"). In the absence of evidence that Kennedy's physician's determination was erroneous, there is no genuine issue of fact for trial regarding Kennedy's post-September 11 inability to return to work.

**13.** *See* Berrien Aff. ¶ 19 and Walton Aff. ¶ 20. Kennedy has come forward with no evidence contradicting this.

**14.** *See* Berrien Aff. ¶¶ 15–16; Berrien Dep. I at 54–55.

*Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), applies to claims of employment discrimination under the ADA. *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir. 1998).

> First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089 (*quoting McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). To state a prima facie case, Kennedy must show: (1) she is within the protected group; (2) she applied and was qualified for a position for which the employer was seeking applicants; (3) she was not hired; and (4) there is an inference that the employment decision was motivated by discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

There is a factual dispute regarding whether Kennedy was permitted to apply for the job in late 1992,[15] and resolving this dispute in her favor, a reasonable jury could conclude that Kennedy "applied" for the job in that she attempted to compete for the position. *E.g.,* Black's Law Dictionary (7th ed.1999) at 96 (defining "applicant" as "[o]ne who requests something");

*cf. also International Broth. of Teamsters v. United States,* 431 U.S. 324, 365–366, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.").

The record shows that a jury could disbelieve St. Francis's assertion that the proposed job was to be of a clinical nature that Kennedy was not qualified for, and could conclude that the job was simply a reconfiguration of Kennedy's eliminated position, that Kennedy was qualified for the proposed position and that the "clinical" angle was only to suit Odesina. Berrien's memorandum in fact describes the position as a "reconfiguration" of the job Kennedy held for four years, and expressly contemplates that Kennedy might get the job. Odesina avers that when asked to develop a job description, "I was given a copy of the [sic] Beverly Kennedy's job description and I was asked to develop the criteria for the new position," and implies that the addition of clinical responsibilities was her addition, since Odesina's promotion to the position was apparently determined prior to the drafting of this description: "I was concerned that I didn't want to be in a full-time administrative position, and I wanted the position to have a hands-on, clinical component. I drafted the job description to suit these needs, with Dr. Berrien's approval and input." Odesina Aff. ¶ 2. Finally, Kennedy claims to have clinical experience that was not considered by Berrien. *See* Kennedy Dep. at 51.

---

**15.** *Compare* Kennedy Dep. at 51 ("I told them that if they posted it or advertised it, I intended to apply for the position, and that is why I think it was never posted or it was never advertised.") *with* Berrien Aff. ¶ 18 ("Both orally and in writing I told plaintiff that she could apply for the clinical service coordinator's position.").

While the undisputed evidence is that the clinical coordinator position was never filled, Kennedy claims that this was because St. Francis sent back over $50,000 in state funding rather than give the position to her. While defendants assert generally that "budgetary constraints imposed by the Hospital" resulted in the non-creation of the position, Berrien Aff. ¶ 19,[16] Odesina avers to the contrary:

> The job description was completed and the funds were available to pay for the position. However, due to the hospital's failure to fill the position, the grant money that was allocated to fill the position had to be returned, and because it went unused, the amount returned would not be extended again until about 1994 or 1995.

Odesina Aff. ¶ 5. Additionally, the September 16, 1992 minutes of the Steering Committee note that "Grant funds in the approximate amount of $54,000.00 will remain unspent at the end of the grant year on September 30, 1992." Def.'s Reply [Doc. # 52] Ex. 2. While the creation of the coordinator position was still under consideration, *see id.*, the decision was made to "freeze" the position shortly thereafter, *see* Steering Committee Minutes of November 18, 1992, Def.'s Reply [Doc. # 52] Ex. 3.

Further, there is evidence from which a jury could conclude that the motivation for St. Francis's actions was Kennedy's disability. While the Steering Committee was discussing eliminating Kennedy's job (March 1992) and creating the new job (February 1992), Steering Committee Member Robert Greenstein recalls that Kennedy's disability was an issue:

Q: Was there a conclusion as to whether the leadership of the service needed to be reorganized?

A: I believe so.

Q: What was the conclusion?

A: I don't have a clear memory of the specifics but I think it was one of the issues was Beverly going to be able to provide the kind of leadership that was necessary . . .

\* \* \* \* \* \*

Q: Do you have any reason to believe Ms. Kennedy's alleged disability was a factor in the decision to terminate her employment?

A: Yes.

Q: And what do you base your belief on?

A: Well, I believe that to the best of my recall [sic], that there were times when Beverly was not able to be present to carry out her duties and I think at times she had to take leave, medical leave. I don't know all the details about what the medical leave was all about, but it was becoming disruptive to the orderly flow of the service.

Greenstein Dep. at 44, 68. While Greenstein's specific reference is to the decision to terminate Kennedy's employment, his testimony also supports Kennedy's assertion that during the subsequent reorganization decision-making process, Kennedy's disability factored into the committee's deliberations, as, for instance, one of the "management issues" being considered in November 1992 when the decision was made to "freeze" the coordinator position. Def.'s Reply [Doc. # 52] Ex. 3.

---

**16.** *See also* Walton Aff. ¶¶ 20–21 ("[The] clinical coordinator's position . . . was never approved and never budgeted for. The Hospital in the early 1990's sought to reduce costs by eliminating positions and not authorizing the creation of new ones.").

While close, this evidence with all inferences drawn in Kennedy's favor could support a jury conclusion that in late 1992 St. Francis had funding and a job description for a reconfigured version of Kennedy's position, which it planned to offer to instead to Odesina, but when Kennedy expressed her intention to apply, St. Francis sent back the grant funding rather than hire her, based on her disability. Thus, Kennedy has established for summary judgment purposes a prima facie case, and while St. Francis points to the fact that the position was never created as a legitimate, non-discriminatory reason for Kennedy's failure to be selected, Kennedy has adduced facts sufficient for a jury to infer pretext. Thus, on this evidence, a jury could conclude that unlawful disability discrimination was the actual reason Kennedy was not considered for the coordinator position in late 1992. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 153, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (while "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination," a prima facie case and sufficient evidence of pretext may permit trier of fact to find unlawful discrimination).

■ However, any claim for failure to hire in 1996, when Odesina was allegedly asked again to develop a job description, *see* Kennedy Aff. ¶ 14(e) and Odesina Aff. ¶ 4, must fail. There is no evidence that Kennedy was aware of a possible opening in 1996 or desired to be considered for the job, nor is there evidence of any returned funding in 1996, and the asserted discriminatory decision-maker, Berrien, had been replaced by heretofore unmentioned Lee Pachter, who offered Odesina the job, which was again never created. Thus, as to any claim of failure to hire in 1996,

Kennedy has failed to establish a prime facie case or any evidence of pretext rebutting the showing that no position was created.

### 3. Retaliation

■ Kennedy ascribes a separate unlawful motive to defendant's decision to terminate her position, failure to consider her for the new coordinator position, and surveillance: retaliation for filing her CHRO complaint, particularly noting Berrien's parenthetical remark that the coordinator position will be given to Odesina unless "Beverly gets her way with the Human Rights Commission and she ends up in the job." Def.'s Mot. Summ. J. [Doc. # 37] Ex. G.

■ Kennedy's retaliation claim, like the disability discrimination claim itself, is brought solely under the ADA, the pertinent provision of which provides:

No person shall discriminate against any individual because such individual has opposed any act or practice *made unlawful by this chapter* or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a) (emphasis added). "To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action." *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999) (citations omitted).

Acts occurring prior to the July 26, 1992 effective date of the ADA are obviously not acts "made unlawful" by the ADA.

Kennedy's initial complaints of disability discrimination were related to acts occurring prior to July 26, 1992, and were claimed as violating the Connecticut Fair Employment Practices Act, not the ADA. *See* [Doc. # 37] Ex. D (bates # 1053). The first indication in the record of any complaint by Kennedy of disability discrimination in violation of the ADA is the February 5, 1993 amendment of her CHRO complaint.

The decision to eliminate Kennedy's position and offer it in reconfigured form to Odesina was made in February or March 1992, and the only actionable failure to rehire claim asserted by Kennedy accrued in late 1992, when St. Francis allegedly sent back grant funding for the coordinator position rather than consider Kennedy. Thus, there can be no causal connection between Kennedy's February 5, 1993 protected conduct of complaining of ADA violations and the 1992 termination and failure to rehire. While a plaintiff "need not establish that the conduct [s]he opposed was actually a violation of the statute so long as [s]he can establish that [s]he possessed a 'good faith, reasonable belief that the underlying challenged actions of the employer violated that law,'" *id.* at 159 (*quoting Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998)), Kennedy could not have believed, at the time she originally protested St. Francis's actions, that these acts violated the ADA, as her CHRO complaint at the time alleged only a violation of the Connecticut statute prohibiting disability discrimination. *See* [Doc. # 37] Ex. D (bates # 1053).

■ As for Kennedy's claim the defendants' allegedly over-aggressive investiga-

tion of her worker's compensation claim was motivated by retaliation, there is no genuine issue of material fact on the causation element of the prima facie case given the uncontradicted evidence that St. Francis played no role in the processing or investigation of Kennedy's worker's compensation claims.

Kennedy claims that the defendants sent investigators to conduct an intrusive investigation into her worker's compensation claims in retaliation for her complaints of disability discrimination. Specifically, she alleges that investigators visited Brenda Crumpton Sumrall, a personal friend from Mississippi, and asked questions about whether Kennedy had a history of strange illnesses or accidents. She also alleges that her worker's compensation claims were investigated more vigorously than those of other employees.

Defendants assert that all activity related to the payment and investigation of worker's compensation claims was undertaken by Aetna, the Hospital's worker's compensation insurer, and that any decision by Aetna with regard to whether or how vigorously Kennedy's claims were to be investigated was made entirely by Aetna, and not any named defendant in this suit. They also argue that absent any evidence that Aetna had any knowledge of Kennedy's complaints of disability discrimination, Kennedy cannot establish any causal link between her complaints of disability discrimination and the overly aggressive investigation of her worker's compensation claims.

In response, Kennedy argues first that Aetna is an agent of St. Francis, and that its actions can thus be imputed to St. Francis as a matter of law.[17] Second,

17. Kennedy's deposition testimony that the investigators "obviously worked for St. Francis or an agent of St. Francis," Kennedy Dep. at 39, does not contradict Walton's averment that any decision with regard to whether or how vigorously Kennedy's claims were to be

Kennedy notes that the Countermeasures, the firm employed by Aetna to undertake the surveillance, met with Jane Piper, a risk management employee of St. Francis, at least twice. *See* Ex. H to Def.'s Mot. Summ. J. [Doc. # 37] (entries on September 16 and 18, 1992).

*Gordon v. New York City Board of Educ.*, 232 F.3d 111 (2d Cir.2000), is instructive on the question of whether Aetna's investigation can be imputed to St. Francis for the purposes of Kennedy's retaliation claim.[18] The plaintiff in *Gordon* had previously filed an unsuccessful lawsuit against her employer, the Board of Education, alleging race discrimination. Prior to filing the suit, the plaintiff received favorable year-end performance evaluations, but after the suit was filed, she was given unsatisfactory evaluations. At trial, the Board conceded the existence of protected activity (the first lawsuit) and an adverse employment action, and admitted that as the defendant in the first lawsuit, the Board itself was aware of first lawsuit. However, the testimony of the individual agents of the Board who had given plaintiff unsatisfactory evaluations was that the agents themselves had no knowledge of the first lawsuit when they rated plaintiff's performance unsatisfactory. After losing at trial, plaintiff argued on appeal that the district court's jury instructions inappropriately required her to prove that the Board's *agents* knew of the first lawsuit.

The Second Circuit found the jury instructions erroneous, holding that as to the causation element that "[t]he lack of

knowledge on the part of particular *individual agents* is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment." *Id.* at 117 (*citing Alston v. New York City Transit Auth.*, 14 F.Supp.2d 308, 312–313 (S.D.N.Y.1998) (emphasis in original)).

> A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicitly upon the orders of a superior who has the requisite knowledge.

*Id.* (*citing Alston*, 14 F.Supp.2d at 311).

Here, while Aetna obviously had knowledge of Kennedy's worker's compensation claim, the record is devoid of evidence from which a jury could conclude that Aetna had any knowledge of Kennedy's complaint of disability discrimination, or that Aetna was "acting explicitly or implicitly upon the orders of a superior who has the requisite knowledge." *Id.* While the reports of the investigators show that the investigators visited St. Francis at least twice and spoke with Jane Piper, a St. Francis risk management employee, there is no showing that Piper had any knowledge of Kennedy's complaint. From the investigators' reports of their conversations with Piper (the only evidence in the record in this regard), the only topic dis-

---

investigated was made entirely by Aetna, Walton Aff. ¶¶ 7–10, because Kennedy's testimony is based on her conception of Aetna as an agent of St. Francis. *See* Kennedy Dep. at 41 ("Q: [W]hen your attorney wrote concerning these individuals from Counter Measures, to whom did you write? A: He wrote to St. Francis and he also wrote to Aetna. Q: Why

did he write to Aetna? A: Because that was who was representing St. Francis.").

**18.** While *Gordon* involved a claim of Title VII retaliation, the elements of a prima facie case of retaliation under both Title VII and the ADA are identical. *Compare Gordon*, 232 F.3d at 113, *with Sarno*, 183 F.3d at 159.

cussed was the details of plaintiff's accident involving St. Francis's ambulance.

The defendants have proffered an affidavit averring that Aetna has the sole authority to decide which claims to investigate and never solicited St. Francis's opinion with regard to the investigation of Kennedy's claim,[19] and Kennedy has not countered with any evidence from which a jury could reach the contrary conclusion. Thus, even under the generous *Gordon* standard, summary judgment is appropriate as there is no genuine issue of material fact left for trial as to whether St. Francis or any named defendant in this suit retaliated against Kennedy for her filing of a CHRO complaint alleging disability discrimination.

### D. Intentional Infliction of Emotional Distress

██ Finally, Kennedy asserts a state law claim of intentional infliction of emotional distress. The statute of limitations for this claim is three years, *see* Conn. Gen.Stat. § 52–577, which runs "from the date of the act or omission complained of," *id.* While Kennedy's complaint is not clear as to the conduct asserted as the basis of this allegation, her brief in opposition to summary judgment and her deposition testimony both focus on the alleged surveillance, the lowered score on her evaluation, and the telephone call to her son. All of these activities occurred in 1992 or earlier, and are thus time-barred, as this suit was commenced in 2000.[20]

### III. Conclusion

For the reasons set forth above, defendants' motion for summary judgment [Doc. # 37] is GRANTED IN PART AND DENIED IN PART: summary judgment is granted as to all claims except (1) Kennedy's assertion that she was improperly prevented from returning to work during five weeks of the final two months of her employment with St. Francis due to St. Francis's alleged perception of her as having a psychological disorder; and (2) Kennedy's claim that she was not considered for the coordinator position in late 1992 because of her alleged disability or the defendants' perception of her as disabled. Inasmuch as there is no individual liability on either of these remaining claims,[21] summary judgment is granted in favor of all individual defendants, leaving only St. Francis remaining as a defendant in this case.

IT IS SO ORDERED.

---

**19.** Walton Aff. ¶¶ 7–10.

**20.** As defendants note in their reply brief, Kennedy failed to address the timeliness of her intentional infliction claim in her opposition to summary judgment.

**21.** *Lane v. Maryhaven Center of Hope,* 944 F.Supp. 158 (E.D.N.Y.1996) (noting that under *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995), the Second Circuit held that Title VII does not give rise to individual liability, and noting that the definition of "employer" is the same under both the ADA and Title VII); *see also EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1279–80 (7th Cir. 1995) (ADA, Title VII, and ADEA statutes are very similar and "[c]ourts routinely apply arguments regarding individual liability to all three statutes interchangeably.").